A. J. RICHARDSON et al., Appellants,

v.

Hugh D. HOLMES, Appellee.

No. 7672.

Court of Civil Appeals of Texas, Beaumont.

June 12, 1975.

As Amended on Denial of Rehearing July 10, 1975.

Ralph M. Zeleskey, Lufkin, Adams & Adams, Jasper, for appellants.

Jim M. Perdue, Houston, Forse, Forse & Hilliard, Newton, for appellee.

DIES, Chief Justice.

This is a medical malpractice suit. Judgment was given for plaintiff (deceased's surviving husband-appellee) on the following jury findings:

1. The defendants (physician-appellant) delayed in transferring Mrs. Rhoda Holmes to another physician longer than a doctor of ordinary prudence would acting under the same or similar circumstances, engaged in the practice of medicine in this or similar communities.

2. That such delay was a proximate cause of Rhoda Holmes' death.

3. That defendants failed to obtain such consultations with specialists in the field of diagnosing and healing abdominal conditions and complications as would have been obtained by a physician of ordinary prudence, engaged in the practice of medicine in this or similar communities during the time Rhoda Holmes was hospitalized in Jasper Memorial Hospital, July 18–28, 1971.

4. That such failure was a proximate cause of her death.

5. That defendants failed to obtain such x-rays of Mrs. Rhoda Holmes abdomen from July 22 through July 28, 1971, as would have been obtained by a physician of ordinary prudence acting under the same or similar circumstances, engaged in the practice of medicine in this or similar communities.

6. That such failure was a proximate cause of her death.

7. That Dr. A. J. Richardson, Jr., failed to obtain the express consent and authorization of Mrs. Holmes to perform the hysterectomy of July 19, 1971.

8. That the hysterectomy resulted in abdominal complications including a gangrenous bowel.

9. That the abdominal complications were a producing cause of her death.

 We first take up the factual sufficiency of the evidence so support the jury's findings that defendants were negligent in delaying Mrs. Holmes' transfer to Beaumont (S.I. No. 1) and were negligent in failing to obtain earlier consultation with specialists (S.I. No. 2). In passing upon the "no evidence" points we consider the evidence favorable to the plaintiff-appellee; in passing upon the "insufficiency of the evidence" points we consider the record as a whole.

A discussion of this evidence follows. Its length is oppressive but unavoidable.

The first medical witness called was Dr. A. J. Richardson, Jr., a general practitioner in Jasper, Texas. Mrs. Holmes was admitted in the Jasper Memorial Hospital on the night of July 18 for elective surgery. On July 19 defendant Dr. W. D. Bailey did an AP repair on the patient; then he and Dr. Richardson performed the hysterectomy. They were recommended by Dr. Thomas R. Jones. On the afternoon of the next day—Tuesday—she began to vomit. The vomit was brown in color, and the patient's temperature was 102.4. Vomiting occurred that afternoon and night, but by 10 P.M. her fever—under medication—was reduced to 99.4. The vomiting at 10 P.M. that evening was "projectile"—or projected out. At 11:25 P.M. vomit was green, but her fever remained just over 99°.

At 1:25 on the 21st of July, the nurses' records show more vomiting of dark liquid which continued at various times into mid-morning. At 10:30 A.M. her stomach was slightly distended, or bloated, which became very distended by afternoon. She vomited dark green which Dr. Richardson said was bile from the gall bladder. At 6:30 P.M. he (the doctor) put a tube in her stomach to help the bloating and vomiting.

On the 22nd, she remained intubated. She had a "fair eight hours" but continued to vomit. At 10:30 A.M. she was x-rayed, which was diagnosed by the x-ray doctor as showing paralytic ileus. On the 24th she still had some pain and vomiting.

On the morning of the 25th, Sunday, Dr. Richardson's diagnosis was "still paralytic ileus, persistent." Blood work and the temperature indicated infection such as peritonitis. Early that morning her temperature was 101.4. At 4:30 A.M. a colon tube was inserted, and the patient expelled large amounts of flatus (gas). At 5 A.M. she appeared jaundiced; she took no nutrition. In fact, the records show she took almost none the entire time of her stay at Jasper. At 10:20 A.M. she sat on the side of the bed. At noon vomiting continued, which at 2 P.M. was at fifteen minute intervals. She remained intubated. By Monday—26th— "My diagnosis was she still had her peritonitis and were [was] still concerned about the persistent ileus and were [was] beginning to consider other things." No further x-rays were ordered. On the 26th "[p]atient had large amount of serous drainage on dressing."

"We [the doctors] did not think she needed an x-ray that day." (26th).

On the 27th she was still intubated. Her complaints were essentially the same as the 26th. At 8:40 patient was given a slush enema producing large amounts "of flatus there with particles of solid stool."

On the next day, x-rays were ordered at 11 A.M. Drainage from the incision was "a large amount of brown serous liquid and foul smelling odor." At 3:20 P.M. she was transferred to Beaumont. Records from the hospital in Beaumont reveal Dr. Miller opened her incision and "immediately voluminous amounts of fecal fluid escaped from the wound, and it became obvious there was a dehiscence beneath the skin of the entire abdominal wall. On removing several of the sutures a loop of gangrenous bowel was presented between the separated fascia edges of the wound with considerable exudate around the bowel indicating that it had been present in this position for sometime. The bowel was gangrenous and black."

Dr. Kenneth T. Miller, a surgeon in Beaumont, admitted Mrs. Holmes to St. Elizabeth's Hospital on July 28th for "diagnosis and treatment for abscess and probable bowel obstruction." After seeing her, he ordered an enema, got partial results, which meant she didn't have a complete obstruction. He operated on her within three or four hours after the initial examination. At the examination "she was alert, cooperative, really belied the severity of her disease. She didn't look like she was all that critical until I opened the wound in the abdomen." She had had no fecal vomiting. This she knew because of her background as a nurse. "The calibre and type of material that was in her nasal gastric tube was certainly not suggestive of obstruction of the gut." He regarded her as a surgical emergency because "in the mid position of the wound there was a brownish, foul, thin fluid escaping from between some of the sutures. . . . On opening the wound it was apparent that there was some bowel interposed between the layers of the ab-dominal wall by virtue of the fact that sutures had given way and the bowel was black gangrenous. This immediately put this into an emergency category. * * *

"On removing several of the sutures a loop of gangrenous bowel was presented between the separated fascial edges of the wound with considerable exudate about the bowel. * * *

"[E]xudate is a reaction of nature . . . tissues are trying to wall off, really trying to heal an area. . . . [T]his doesn't occur immediately, it probably takes, oh, I'm sure within twelve hours there is some of it forming, but it is hard to tell how long it has been there. I would think that this gut had been interposed for at least twelve hours. . . . [W]hat gave a false clinical impression perhaps, in that this patient's abdomen when I saw her was not real tight and distended like in an obstruction or even an ileus . . . and yet she was apparently decompressing. I think she told me this leakage had started the day before. . . . It [the bowel] was between the skin and the fascia which is the fat layer." It was not inadvertently sewed into the fascia. There is no way to tell what caused it. It could be the result of an infection. His diagnosis of mesenteric thrombosis or gangrenous bowel was suspected before he opened the wound by the foul drainage. There was no way of knowing of the black bowel except opening the wound. It was the foul drainage that put him on notice of the problem. He feels that by virtue of his special training he may be able to determine things in cases of intestinal obstruction that a general practitioner would not be familiar with. The general practitioner is not qualified to reopen her incision and do what was necessary confronted with a gangrenous bowel. "I'm sure the woman had paralytic ileus in some form post-op. How long, where this became mesenteric thrombosis with devitalized bowel is something I don't know how one could determine because a dynamic ileus can last sometimes

for a week." He removed approximately eighty percent of her bowel. Her gangrenous bowel "[p]robably could have occurred in three days." A mysenteric thrombosis is a clotting of blood in the veins and arteries. It is very difficult in these cases to know when one should go back in. At the time he originally saw her, he did not suspect mesenteric thrombosis. "The convincing factor as far as I was concerned was when I did this surgery and opened her wound." Her problems were caused by the clotting. She did pretty well after the surgery and would probably have made it if she hadn't developed renal failure.

The next medical witness was Dr. Edward A. Fitch of Pasadena, Texas, a general and thoracic surgeon. He had reviewed the hospital and autopsy records of Mrs. Holmes. From the records he concluded Mrs. Holmes had paralytic ileus at Jasper following the surgery. The records "gave me the definite notion that a specialist . . . should have . . . given an opinion on the patient." He was asked when this would have been appropriate in the exercise of proper standards of medicine. His answer: "The records don't give me the information as to when it would have been appropriate. It was sometime prior to the 26th. On the 26th it was undoubtedly appropriate to get their consultation on the 26th, according to the records."

He was asked the cause of her problem that required ultimate surgical intervention. He answered: "I am not endowed with divine powers." He thought the Jasper doctors recognized and adequately treated the paralytic ileus. The limits of this disorder would probably be put "at anywhere from one day to ten days, . . [b]ut on the fifth or sixth day of an unresponding paralytic ileus, an astute physician starts looking for hidden factors. And on the sixth and seventh day he does everything within his power to find other factors. . . . [Y]ou should be very, very alarmed when the sixth and seventh day

come around. [I]n my opinion, it is perfectly acceptable for the 'occasional abdominal surgeon' to handle his own paralytic ileus up through the third and fourth day. Beyond that the condition is not common enough in the ordinary occasional abdominal surgeon's practice for him to be conversant with it unless he has special skills. . . . I am convinced that if she had been seen by a surgeon on the 26th she would have had surgery on the 26th. Before the 26th, I can't swear to it.

"The records tell us that we know there was advanced gangrene on the 28th in Beaumont. We know that the gangrene or serious irreversible gangrenous conditions had to exist on the 27th for it to have been that advanced on the 28th. I think it is possible that the build-up to that existed on the 26th."

He testified that from a medical standpoint it is a judgment call when a paralytic ileus converts itself into a mechanical obstruction.

Dr. Robert Bucklin, attorney, pathologist of La Jolla, California, had reviewed Mrs. Holmes' hospital and autopsy records. She remained at St. Elizabeth's in Beaumont until August 27 when she was transferred to the kidney unit at St. Joseph's in Houston. She died on September 6, 1971. "An autopsy showed extensive brain changes, inflammatory changes, bronchial pneumonia, pulmonary abscesses, multiple thrombi in mesenteric and retroperitoneal veins, and evidence of vascular disease." He concluded from the records, "Yes, it is quite obvious from the hospital records that the delay in instituting appropriate treatment, especially surgery, did result in serious complications which eventually caused the death of Mrs. Holmes."

In *King v. Flamm*, 442 S.W.2d 679, 681 (Tex.1969) the Texas Supreme Court had this to say:

"The general practitioner is not required to consult with a specialist, however, on

every conceivable complication that may arise in his practice. . . . If he exercises the care and skill of other physicians similarly situated, he is not responsible for an error of judgment even though a specialist would not have made the same mistake. But there is a duty to seek consultation with, or refer the patient to, a specialist when he knows, or in the exercise of reasonable care should know, that the services of a specialist are indicated. Here, as in other cases of alleged medical malpractice, the defendant is to be judged on the basis of the standards and practices of his profession. If there is expert testimony fairly supporting the conclusion that a reasonably careful and prudent general practitioner would have sought consultation under the same or similar circumstances, the trier of fact is entitled to find that the defendant was negligent in failing to do so."

See also 35 A.L.R.3d 349, 371 (1971).

■ So clearly our Supreme Court has said that conduct of which the jury found defendants guilty in S.I. Nos. 1 and 2 is medical malpractice. And viewing the evidence herein summarized in the light most favorable to appellees—which we must—we believe the evidence factually sufficient to support the jury's findings to these issues.

Appellant's points of error one through six are overruled. This makes it unnecessary to address ourselves to points seven through nine, and they are overruled.

■ Points ten through fifteen complain of the factual deficiency of the evidence to support findings of proximate cause of Rhoda Holmes' death resulting from its findings of S.I. Nos. 1 and 3. Proximate cause must exist of course and involves two elements, both of which must be present: cause in fact and foreseeability. *Baumler v. Hazelwood*, 162 Tex. 361, 347 S.W.2d 560, 564 (1961).

Dr. Miller's testimony reveals that the necessity for the removal of eighty percent of Mrs. Holmes bowels was gangrene, which began at some time before the Beaumont operation of the 28th. That in such situation the sooner surgery is instituted the better the patient's chance of recovery.

■ Dr. Fitch was convinced if she had seen a surgeon on the 26th, she would have had surgery. Dr. Bucklin testified, "Yes, it is quite obvious from the hospital records that the delay in instituting appropriate treatment, especially surgery, did result in serious complications which eventually caused the death of Mrs. Holmes." We believe that the foregoing evidence supports the jury finding that the delay in transferring Mrs. Holmes to another physician was a proximate cause of her death. The "no evidence" points are overruled as being without merit. When the record is considered as a whole, we are also of the opinion that "insufficient points" and against the overwhelming preponderance of the evidence points are also without merit and are thus overruled.

■ Appellant's twenty-seventh point complains of the trial court's instruction that the jury could consider circumstantial evidence in ascertaining the facts. We believe this instruction was improper in light of the requirements and language of *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779 (1949), but in view of the fact this record is replete with expert medical testimony as required by Bowles, we find it harmless error. Texas Rules of Civil Procedure, rule 434.

Appellant's twenty-eighth point complains of the "Trial Court's refusal to permit defendants to even discuss before the jury plaintiff's remarriage, or to prove plaintiff's present wife's earnings or the fact that she was doing her household chores in mitigation of damages."

Plaintiff remarried October 20, 1973. This fact was made known to the jury, but defendants were not permitted to show her earnings or contributions in mitigation of

plaintiff's damages. An economist, Dr. Donald L. Huddle, testified the "economic loss" of Mrs. Holmes was $249,119 based on such information as her age, health, earnings, work about the home and farm.

Effective at the time this case was tried, Vernon's Tex.Rev.Civ.Stat.Ann. art. 4675a (1974–1975) follows:

> "In an action under this title, evidence of the actual ceremonial remarriage of the surviving spouse is admissible, if such is true, but the defense is prohibited from directly or indirectly mentioning or alluding to any common-law marriage, extramarital relationship, or marital prospects of the surviving spouse."

■ Upon initial reading it might appear that the statute meant to allow not only the fact of remarriage but all reasonable inferences and evidence which might be deducted therefrom. For the reasons below, we do not believe that this is the reasonable statutory construction. The cause of action of wrongful death and the recoverable damages are established at the time of death. Dobbs, *Remedies* § 8.6 at 568 (1973); 87 A.L.R.2d 252 (1968). The effect of subsequent developments after death should not alter the rationale behind the principle and thereby reduce lawfully recoverable damages. Secondly, as in most jurisdictions, it is the rule in Texas that a tortfeasor's obligation to make restitution for the injury he has caused is undiminished by any compensation received by the injured party from any collateral source. *Kainer v. Walker*, 377 S.W.2d 613 (Tex. 1964). To allow evidence on the *effects* of remarriage would clearly violate this rule. Further the language of the statute permits only "evidence of the actual ceremonial remarriage"—and nothing more. In light of the above holdings, we feel that if the legislature had intended to allow evidence other than the mere fact of remarriage, it certainly could have stated such. To us, any other interpretation of Tex.Rev.Civ.Stat. Ann. art. 4675a would necessarily involve

judicial surmise into the realm of the legislators' mental processes, a position we do not adopt. Such an interpretation would also involve a conflict with the principles as stated by our Supreme Court.

We also note that at least three other states have also held that while the fact of remarriage is admissible, such evidence does not operate to diminish the damages which are recoverable. See *Watson v. Fischbach*, 54 Ill.2d 498, 301 N.E.2d 303 (1973); *Dubil v. Labate*, 52 N.J. 255, 245 A.2d 177 (1968), and *Glick v. Allstate Insurance Company*, 435 S.W.2d 17 (Mo.App.1968, no writ). The court below was proper in allowing only the fact of remarriage. Appellant's point twenty-seven is without merit and overruled.

■ Appellant's twenty-ninth point is "[t]here was no evidence Rhoda Holmes was receiving fringe benefits in her employment or that she ever had, and the trial court erred in overruling defendant's objection to such testimony on this ground thereby permitting the jury to consider the economist's testimony on damages including the same." The computed fringe benefits given by the economist included social security, private pensions, retirement, and life and health insurance. The present value which was given to these fringe benefits was $17,351. This figure was computed by the economist by taking 7.8% of the $222,446 amount which was stated to be the amount of Mrs. Holmes' lost earnings (the $222,446 is exactly the amount awarded by the jury). We sustain this point and hold that this evidence should not have been admitted.

■ Appellant's point thirty complains that the damage finding of $222,446 is excessive. The thrust of their argument concerns the refusal of the trial court to admit as mitigation the earnings and/or contributions of the second wife—which we have heretofore answered—and the inclusion of the "fringe benefits" in the economist's opinion of total economic loss—which we have also previously dealt with. It thus

becomes our duty to suggest a remittitur and the time within which to file the same. Tex.R.Civ.P. 440. Having determined that the inclusion of "fringe benefits" in the award was erroneous, we are of the opinion that the damage award of $222,446 is excessive by $17,351. Plaintiff is granted ten days from the date of this opinion within which to file remittitur of this amount. If such remittitur is filed, the judgment of the trial court will be reformed and affirmed. Otherwise it will be reversed and the cause remanded.

Finding no merit to the other points of error, they are overruled.

Affirmed on condition.