Brian Bernard BRADLEY, M.D.; Anibal R. Hadad, M.D.; Humana Hospital Corporation, Inc. d/b/a Humana Hospital Southmore, Appellants,

v.

Patricia Kay ROGERS; Mark Layne Howell, Individually, and as Heir of the Estate of Patricia Ann Howell, Deceased, and on Behalf of the Estate of Patricia Ann Howell, Deceased; Albert Voytek; Elizabeth Voytek; Donnie Ray Harvey, Jr.; and Gary Alan Harvey, Appellees.

No. A14–92–00793–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 30, 1994.

Rehearing Denied July 28, 1994.

Roger D. Townsend, Ben Taylor, Vicki F. Brann, William Sherwood, Thomas P. Sartwelle, John Roberson, Brenda Strama, Houston, James K. Peden, Dallas, for appellants.

Kirk P. Watson, Jerry Galow, Austin, Richard N. Countiss, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and ELLIS and LEE, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

This is a medical malpractice case. Patricia Rogers suffered severe injuries and Patri-

cia Howell died following liposuction surgery performed by Dr. Hugo Ramirez. Because of complications that arose after that surgery, Rogers and Howell were treated by a team of doctors at Humana Hospital Southmore (Humana) that included Dr. Ramirez, Dr. Brian Bradley, Dr. Anibal Hadad, and Dr. Margarita Muniz. Rogers and Howell's survivors sued not only Dr. Ramirez, but also the rest of the team of doctors at Humana for negligence. They also sued Humana and several nurses. Dr. Ramirez filed for bankruptcy several months after suit was filed. After a three-month trial, a jury returned a verdict in favor of the plaintiffs and awarded damages in excess of $15 million. The trial court rendered judgment in accordance with the jury's verdict and Dr. Bradley appeals.[1] Because we find an absence of proximate cause, we reverse and render.

On Friday morning, March 27, 1987, Dr. Hugo Ramirez, a Pasadena obstetrician, performed liposuction surgery on Patricia Howell and Patricia Rogers in a clinic across the street from Humana Hospital. Liposuction is a medical procedure by which fat tissue is literally sucked out of the body by a device called a cannula. Dr. Ramirez performed the surgery first on Rogers and then on Howell. He used the same cannula on both Rogers and Howell. After the surgery, Dr. Ramirez instructed Howell and Rogers to wear special tight-fitting girdles to reduce blood loss and "third spacing," or fluid loss into the abdominal cavity. Howell's girdle covered her body just below her breasts to just above her ankles. Rogers' girdle had shoulder straps and covered her body from her chest to just above her knees. From Friday evening to Sunday afternoon, both Howell and Rogers suffered increasing pain which they believed was the normal result of surgery. By late Sunday afternoon, both became critically ill.

On Sunday afternoon, Howell and Rogers were experiencing such pain that they returned, at different times, to Dr. Ramirez's office. Howell had removed her girdle earlier that day in the hope of relieving her discomfort. Dr. Ramirez examined Howell in his office at approximately 1:00 p.m. She was pale, complaining of pain in her legs, and was suffering from low blood pressure. Dr. Ramirez concluded that Howell was suffering from dehydration, acute iron deficiency anemia, and low blood pressure caused by the removal of her girdle. Dr. Ramirez, with the assistance of Mr. Howell, put a new girdle on Howell. Dr. Ramirez admitted Howell to the maternity ward at Humana Hospital at 1:30 p.m. At that time, she had a palpable blood pressure of only 50 systolic. Dr. Ramirez put Howell on IV fluids, administered medication to elevate her blood pressure and gave her blood. He also placed her on oxygen and ordered a complete blood count; arterial blood gases were also drawn.

When Rogers returned to Dr. Ramirez's office, she was met by his nurse. Rogers had vomited blood that morning and was suffering from low blood pressure. From the hospital, Dr. Ramirez instructed his nurse to have an ambulance transport Rogers to the Humana emergency room. Upon her arrival at approximately 4:30 p.m., Rogers was pale, hyperventilating, tachycardic, had no audible blood pressure, and was in shock. The emergency room physician, Dr. Enrique Molano, assessed her condition as critical and called Dr. Ramirez. Dr. Molano was finally able to obtain a blood pressure of 144/60 and, after reviewing her white blood count and arterial blood gases, diagnosed acute anemia, hypovolemic shock, and a possible GI bleed. Within an hour, Dr. Molano transferred Rogers to the intensive care unit (ICU) and called in Dr. Anibal Hadad, a surgeon. Dr. Hadad obtained Rogers' histo-

1. Dr. Bradley and Humana were the only defendants below to perfect an appeal and file briefs. Dr. Hadad perfected an appeal but then settled with Rogers before filing his brief. That appeal was dismissed by this court pursuant to the parties' joint motion. Likewise, Humana settled with Rogers after oral argument and that appeal was also dismissed by this court pursuant to the

parties' joint motion. Rogers and the Howell plaintiffs also perfected a cross-appeal from the judgment rendered in favor of Dr. Muniz. However, Rogers and the Howell plaintiffs do not direct any of their points of error or argument specifically to Dr. Muniz. Hence, for the sake of simplicity, we will refer to Rogers and the Howell plaintiffs only as appellees.

ry from Dr. Ramirez. Dr. Hadad examined Rogers in the ICU at approximately 6:45 p.m. Based upon his examination, Rogers' history, and a review of her chart, Dr. Hadad diagnosed Rogers as suffering from acute anemia, hypovolemic shock, and an upper GI bleed, possibly secondary to stress. Dr. Hadad, among other things, put Rogers on IV fluids and oxygen and he inserted a nasogastric tube. Arterial blood gases were drawn and blood was given.

Meanwhile, Dr. Ramirez continued to treat Howell in the maternity ward until approximately 7:40 p.m., when he consulted with Dr. Hadad. By that time, Howell still had not responded to treatment. Despite an initial dosage of medication to elevate her blood pressure and the receipt of fluids and blood, Howell's palpable blood pressure was only 60 systolic and her heart rate and respirations had increased. Howell was then transferred to ICU and put under Dr. Hadad's care. Dr. Hadad initially examined Howell at 8:15 p.m., and found that she was shocky, severely cyanotic, tachycardic, she had no detectable blood pressure, and was in respiratory distress. Dr. Hadad's consult note reflects that Howell was 48 hours post-liposuction, that she was suffering from shock of unexplained etiology—possibly third space or acute anemia, and that the possibility of sepsis had not been ruled out. After two unsuccessful attempts by an anesthesiologist, Dr. Hadad put Howell on a respirator. Dr. Hadad ordered medication to elevate her blood pressure and a second complete blood count. He also inserted a Swan Ganz catheter to monitor pulmonary artery pressure; however, Howell's condition continued to deteriorate. By 10:00 p.m., more than eight hours after her admission, Howell was not alert or oriented. She was hypotensive, had blood clotting difficulties, metabolic acidosis, and multiple organ failure. Suspecting at this time that Howell might have a pulmonary embolism, Dr. Hadad called in Dr. Brian Bradley for pulmonary management. Dr. Hadad also called in internist, Dr. Margarita Muniz.

Dr. Bradley arrived at Howell's bedside at approximately 10:00 p.m. Sunday night. Dr. Bradley examined Howell and determined that she was not suffering from a pulmonary embolism. Dr. Bradley discovered blisters on Howell's abdomen above the beltline of her girdle, which had been rolled down to her waist. He aspirated one of them and performed a gram stain test to determine the presence of infection. Dr. Bradley's consult note reflects his impression that Howell was suffering from overwhelming sepsis, septic shock from a gram positive organism, hemodynamic instability, and renal failure. Dr. Bradley instituted a five-prong treatment plan that included blood and urine cultures, broad spectrum antibiotics, steroids, burn care, and a Swan–Ganz catheter. Approximately thirty minutes later, Dr. Bradley learned that there was another patient with similar problems; namely, Rogers. Because Rogers, who was now some six hours post-admission, also had blisters in her groin area around the edges of her girdle, Dr. Bradley aspirated them and performed a gram stain which again yielded a positive result. Dr. Bradley's diagnosis of Rogers, as reflected in his consult note, was that she was suffering from septic shock and possible pulmonary edema. Dr. Bradley prescribed multiple broad spectrum antibiotics to fight off the infection. Although not in the charts or in consult notes, the doctors thought that the septic shock suffered by both patients was caused by a soft tissue infection known as cellulitis. According to the doctors, that diagnosis was founded upon the fact that they found no signs of infection at the liposuction incision sites.

In caring for Howell, Dr. Bradley was part of a team comprised of Drs. Ramirez, Hadad, and Muniz. That same team, with the exception of Dr. Muniz, also treated Rogers. At 3:00 a.m. Monday, after administering antibiotics and detecting no further progression of infection, the team concluded that all appropriate measures had been taken and that time was required to allow the antibiotics to work. Drs. Hadad and Muniz went home; however, Dr. Bradley remained at the hospital in case the patients encountered respiratory difficulties. The ICU nurses monitored

the patients' conditions and reported to Dr. Bradley throughout the early morning hours. At 6:30 a.m. on Monday morning, Dr. Bradley was called away from the hospital to attend another patient.

The medical records reflect that Howell's blood pressure, as taken by doppler, was as low as 40 and never rose above 74 throughout the night. Rogers' blood pressure was relatively stable throughout the night, but began to drop somewhat during the early morning hours. At 7:40 a.m., an ICU nurse called internist, Dr. Muniz, at home, to inform her of Rogers' low blood pressure and poor urine output. Dr. Muniz instructed the nurse to call renal specialist, Dr. Henry Muniz. He later helped to arrange for the transfer of both patients. Dr. Margarita Muniz arrived at the hospital at approximately 8:00 a.m. to check on both Rogers and Howell. Upon examination of Howell and Rogers, Dr. Muniz discovered skin changes which were ultimately diagnosed as necrotizing fasciitis; a serious, rapidly progressing soft-tissue infection that results in black (dead) skin tissue that extends from the top layer of skin, the epithelium, down through the layer of tissue just above the muscle, the fascia. It was decided to transfer Howell and Rogers to St. Luke's Hospital for further management.

The women were life-flighted to St. Luke's sometime around noon Monday. After further assessment and preparation, both women underwent surgical debridement for removal of the dead tissue. Howell went to surgery at approximately 4:15 p.m. and died on the operating table at 6:02 p.m. Rogers survived, but only after undergoing numerous debridements to halt the spread of the infection. She also had several subsequent reconstructive surgeries.

In the Howell case, Humana and Dr. Hadad apparently settled before trial. The jury found Dr. Ramirez 75% at fault and Dr. Bradley 25% at fault. Dr. Muniz was exonerated from liability. The jury did not find gross negligence. Based upon the jury's award, and with the application of the liability cap in article 4590i, the subtraction of offsets for settlement, and the addition of prejudgment interest, the trial court's judgment awards the Howell plaintiffs $6,108,861.45 in damages, plus post-judgment interest. The judgment holds Drs. Ramirez and Bradley joint and severally liable for those damages, plus court costs.

In the Rogers case, the jury found Dr. Ramirez 50% at fault and Drs. Hadad and Bradley each 25% at fault. The jury also found that Humana and Dr. Muniz were not negligent. The jury further found that an agency relationship existed between Humana and Drs. Hadad and Bradley. The jury did not find gross negligence. Based upon the jury's award and with the addition of prejudgment interest, the trial court's judgment awards Rogers $9,057,981.66 in damages, plus post-judgment interest. Because Drs. Hadad and Bradley were found to be Humana's agents with respect to their treatment and care of Rogers, the judgment holds Humana, along with Drs. Ramirez, Hadad, and Bradley, joint and severally liable for the amount awarded to Rogers, plus court costs. After the parties filed various post-verdict motions which were denied by the trial court, this appeal was perfected.

In his second point of error, Dr. Bradley contends that there is legally and factually insufficient evidence to support the jury's finding that his alleged negligence proximately caused Howell's death and Rogers' injuries.

■ When both legal and factual sufficiency points are raised we must first examine the legal sufficiency. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 410 (Tex. 1981). In reviewing a "no evidence" point, we are to consider only the evidence and inferences that tend to support the jury's findings and disregard all evidence and inferences to the contrary. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988). A "no evidence" point of error must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight

to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; and (4) the evidence conclusively establishes the opposite of a vital fact. *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ) (citing *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.)). If there is any evidence of probative value to support the jury's findings, we must uphold the findings and overrule the points of error. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■■■■ If the findings are supported by legally sufficient evidence, we must then review the factual sufficiency of the evidence by weighing and considering all the evidence, both in support of, and contrary to, the challenged findings. *Id.* The jury's findings must be upheld unless they are so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 735 (Tex.1988). Because the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we may not substitute our judgment for that of the jury's simply because we may disagree with the jury's findings. *Hebert v. Hebert*, 754 S.W.2d 141, 142 (Tex.1988); *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

■■■■ To prove medical malpractice in Texas, the plaintiff-patient has the burden of proving by direct or circumstantial evidence: (1) that the physician-defendant breached the standard of care; that is, the physician undertook a mode or form of treatment which a reasonable prudent member of the medical profession would not have taken under the same or similar circumstances; and (2) that such a breach was the proximate cause of the plaintiff's injuries; that is, there is a reasonable medical probability that the plaintiff's injuries were caused by the negligence of one or more of the defendants. *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex.1988); *Hood v.*

*Phillips*, 554 S.W.2d 160, 165 (Tex.1977); *Lenger v. Physicians Gen. Hosp.*, 455 S.W.2d 703, 706 (Tex.1970); *Insurance Co. of North Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966); *Hart v. Van Zandt*, 399 S.W.2d 791, 792–93 (Tex.1965); *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (1949); *McMillin v. L.D.L.R.*, 645 S.W.2d 836, 839 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). Expert testimony from a doctor of the same school of practice as the defendant is ordinarily required to meet this burden. *Hood*, 554 S.W.2d at 165–66; *Bowles*, 219 S.W.2d at 782.

The undisputed evidence at trial established that Howell and Rogers contracted an infection, that both were critically ill by the time they were seen by Dr. Bradley, and that the condition of both Howell and Rogers remained unstable throughout their treatment. Both women were infected during the liposuction procedure. In addition, both women were more than two and one-half days, post-surgery and had been in the hospital for several hours before Dr. Bradley was finally called in to assess them. Nevertheless, appellees contended that the failure of Dr. Bradley to diagnose Howell and Rogers with necrotizing fasciitis and to recommend surgery before 8:00 a.m. Monday proximately caused Howell's death and the extensive debridement that was required on Rogers.

■■■■ To establish proximate cause, a plaintiff must prove: (1) foreseeability, i.e., that the defendant should have anticipated the danger that resulted from his or her negligence; *and* (2) cause-in-fact, i.e., that the defendant's negligence was a substantial factor in bringing about the injury and without which no harm would have occurred. *See Campos v. Ysleta Gen. Hosp. Inc.*, 836 S.W.2d 791, 794 (Tex.App.—El Paso 1992, writ denied); *Ortiz v. Santa Rosa Medical Ctr.*, 702 S.W.2d 701, 704–5 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.); *Richardson v. Holmes*, 525 S.W.2d 293, 298 (Tex.App.—Beaumont 1975, writ ref'd n.r.e.). With regard to cause-in-fact, the plaintiff must establish a causal connection based upon "rea-

sonable medical probability," not mere conjecture, speculation or possibility. *See Duff*, 751 S.W.2d at 176; *Lenger*, 455 S.W.2d at 706; *Campos*, 836 S.W.2d at 794. "Proof of mere possibilities will not support the submission of an issue to the jury." *Duff*, 751 S.W.2d at 176.

The rule of "reasonable medical probability" relates to the showing that must be made to support an ultimate finding of fact and not to the standard by which the medical expert must testify. *Lenger*, 455 S.W.2d at 707. In other words, "reasonable probability" is determined by consideration of the substance of the testimony of the expert witness and does not turn on semantics or the use by the witness of any term or phrase. *Insurance Co. of North Am. v. Myers*, 411 S.W.2d 710, 713 (Tex.1966). A plaintiff is not required to establish causation in terms of medical certainty nor is he or she required to exclude every other reasonable hypothesis. *King v. Flamm*, 442 S.W.2d 679, 682 (Tex.1969); *Rose v. Friddell*, 423 S.W.2d 658, (Tex.App.—Tyler 1967, writ ref'd n.r.e.). Reasonable inferences drawn from the evidence are permissible. *Merrell Dow Pharmaceutical, Inc. v. Havner*, No. 13–92549–CV, slip op. at 8, 1994 WL 86436 (Tex.App.—Corpus Christi March 17, 1994, n.w.h.). However, while expert medical testimony concerning the *possible* causes of the condition in question are admissible to assist the trier of fact in evaluating other evidence in the case, a *possible* cause only becomes *"probable,"* when in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. *Lenger*, 455 S.W.2d at 707; *Parker*, 440 S.W.2d at 47; *Tsai v. Wells*, 725 S.W.2d 271, 274 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). [emphasis added] This is the outer limit of inference upon which an issue can be submitted to the jury. *Parker*, 440 S.W.2d at 47.

The trier of fact may decide the issue of proximate causation in medical malpractice cases when: (1) general experience and common sense will enable layman fairly to determine the causal relationship between the event and the condition; (2) scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) a probable causal relationship is shown by expert testimony. *Parker v. Employers Mut. Liab. Ins. Co. of Wis.*, 440 S.W.2d 43, 46 (Tex.1969); *Lenger*, 455 S.W.2d at 706. This does not mean that the court, in determining whether the issue should be submitted to the jury, must consider only evidence of one type to the exclusion of that falling into other categories. *Id.*

In the instant case, the medical condition and treatment in question were clearly beyond the general experience and common sense of laymen. *See Kieswetter v. Center Pavilion Hosp.*, 662 S.W.2d 24, 27 (Tex. App.—Houston [1st Dist.] 1983, no writ). Thus, appellees tried through expert testimony, to establish a "traceable chain of causation" based upon general scientific principles or a "probable causal relationship," between the failure to perform surgery and Howell's death and Rogers' injuries. We hold that they did not succeed in either the Howell case or the Rogers case. In the Howell case, the only evidence of causation was of lost chance of survival. In the Rogers case, the evidence simply fell short of proximate cause. Liability for lost chance of survival is an impermissible assignment of legal responsibility based on mere possibility and evidence of lost chance does not constitute evidence of proximate cause. *See Kramer v. Lewisville Memorial Hosp.*, 858 S.W.2d 397, 405 (Tex. 1993).

In *Kramer*, the husband, individually and on behalf of his wife's estate and their children, filed a medical malpractice action against a hospital and several other defendants for failure to timely diagnose his wife's cancer of the cervix. 858 S.W.2d at 399. Specifically, the plaintiffs alleged that the hospital lab misread Mrs. Kramer's pap smear in August 1985, thereby resulting in a delay of appropriate treatment which would have saved her life. 858 S.W.2d at 399. All

but the hospital settled the case before trial. *Id.* There was conflicting evidence at trial regarding Mrs. Kramer's chances for survival in August 1985. *Id.* Although the negligence and proximate cause questions were submitted to the jury, the trial court refused the Kramers' request for additional questions and instructions on Mrs. Kramer's lost chance of survival at the time of her initial pap smear in August 1985. *Id.* In any event, the jury found the hospital was negligent, but failed to find that its negligence was a proximate cause of Mrs. Kramer's death and a take-nothing judgment was rendered in favor of the hospital. *Id.*

In affirming the lower court judgments, the Texas Supreme Court held that the Wrongful Death Act and the Survival Statute do not authorize recovery for lost chance of survival or cure in a medical malpractice action. 858 S.W.2d at 398. The court recognized that "reasonable medical probability" or "reasonable probability" requires a plaintiff to adduce evidence that it is "more likely than not" that the ultimate harm or condition resulted from the defendant's negligence. 858 S.W.2d at 400. The court stated that "the ultimate standard of proof on the causation issue is whether, by a preponderance of the evidence the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Id.* The court concluded:

> The effect of these standards is to bar recovery where the defendant's negligence deprived the tort victim of only a 50% or less chance of avoiding the ultimate harm. Hence, where pre-existing illnesses or injuries have made a patient's chance of avoiding the ultimate harm *improbable even before* the allegedly negligent conduct occurs—i.e., the patient would die or suffer impairment anyway—the application of traditional causation principles will totally bar recovery, even if such negligence has deprived the patient of a chance of avoiding the harm.

*Id.* (citation omitted)

The record in this case consists of fifty-four volumes of statement of facts and seven boxes of exhibits. Yet, appellees cite scant evidence in support of the jury's finding of proximate cause. Of the seventy-two pages in their original brief, appellees devote a mere two and one-half pages to that issue. Appellees filed two short supplemental briefs emphasizing in slightly more detail the evidence of causation cited in their original brief. Appellees offered the testimony of the following three experts: (1) Dr. Layne Gentry, a board certified internal medicine doctor with a sub-specialty in infectious disease and the chief of infectious disease at St. Luke's Episcopal Hospital; (2) Dr. John Alexander, an internal medicine doctor with a sub-specialty in pulmonary medicine; and (3) Dr. Robert Ersek, a plastic surgeon who has been performing liposuctions since the late 1960s and is an author and lecturer on liposuction procedure and its complications. Dr. Gentry treated Howell and Rogers at St. Luke's. Drs. Gentry and Ersek were appellees' designated experts. Dr. Alexander was Dr. Bradley's designated expert and had written an article, after the occurence in this case, describing a case of necrotizing fasciitis resulting from liposuction.

Mindful that we must review the evidence in the light most favorable to the jury's finding and that we must disregard all contrary evidence and inferences, we can find no evidence of proximate cause. The testimony of Drs. Gentry, Alexander and Ersek does not establish evidence of proximate cause. As in *Kramer*, the Howell plaintiffs brought this action under the Wrongful Death Act and Survival Statute, pleading lost chance of survival along with negligence. Unlike the *Kramer* plaintiffs, the Howell plaintiffs did not request a jury question on lost chance of survival. Rather, the Howell plaintiffs and Rogers each requested a single jury question on negligence and proximate cause. Proceeding under that pretense, however, appellees offered evidence of only mere possibility and lost chance of survival. Consistent with the manner in which they sought to prove all of the elements of their case, appellees attempted to prove proximate cause only by way of vague generalities or improper infer-

ences founded upon speculative conclusions. Although it is now permissible for experts to give an opinion on ultimate issues, appellees never once asked an expert directly, whether Dr. Bradley's failure to recommend surgery before 8:00 a.m. Monday proximately caused Howell's death or the extensive debridement required on Rogers. *See* TEX.R.CIV.EVID. 704; *Louder v. Deleon,* 754 S.W.2d 148, 149 (Tex.1988); *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 365 (Tex.1987).

We will first consider the issue of causation as it relates to Howell. In response to a hypothetical question based upon the team's on-going assessment and treatment of both patients, Dr. Gentry testified:

> The sooner you get the dead tissue, surgical debridement of the dead tissue, the shorter the hospital stay, the better the patient is going to do, and the less tissue destruction you're going to have.

He also testified based upon that same hypothetical, that a "long delay" before surgery "increases the risk of death" and "decreases the chance of survival." Although not cited by appellees, Dr. Gentry further testified that "mortality is directly related to how quickly [the dead tissue] gets debrided" and that "the sooner aggressive therapy of antibiotics and debridement is begun, the better off the patient is going to be." Dr. Gentry testified that "it would be rare for beta hemolytic strep infection to progress to death in the face of appropriate treatment."

 Although the precise words of "reasonable medical probability" are not required, evidence of causation must still rise above mere conjecture or possibility. *See Duff,* 751 S.W.2d at 176; *Merrell Dow,* slip op. at 9. Here, Dr. Gentry testified in generalities and never directly stated that Howell would have lived or that Rogers would have required less debridement if surgery had been performed Sunday night or early Monday morning. In fact, Dr. Gentry conceded that his answers to hypothetical questions were just that; hypothetical. He could not say whether his responses applied to either Howell or Rogers because he had not recently reviewed the records and was not present during their treatment at Humana. Nonetheless, Dr. Gentry's opinion that *a patient* presenting as Howell and Rogers did, is generally *"going to do better"* or *"be better off"* if surgery is not delayed, does not say anything about the particular outcome in this case and is nothing more than broad conjecture or speculation.

Dr. Gentry did not testify, as appellees contend, that Howell died because of a long delay in treatment. Of course, that was certainly the inference that appellees sought to convey. Although he implied that there was a long delay in this case, Dr. Gentry merely stated in response to a general question that the risk of mortality increases when surgery is delayed to stabilize a patient. Dr. Gentry explained that reasonable medical practice dictates that when dealing with necrotizing fasciitis and a patient who presents in serious but not moribund condition, no more than four hours should be devoted to non-surgical therapy before surgery *at any risk* should be performed. He acknowledged, however, that there is no "magic period," or given rule for the amount of time that should be allowed to stabilize a patient before surgery. Although there is "some evidence," albeit disputed, that the defendant-physicians were in fact dealing with necrotizing fasciitis before 8:00 a.m. Monday, Dr. Gentry never stated with any modicum of confidence, taking that evidence as true, that Howell died because surgery was delayed more than four hours. In fact, he could not say based upon reasonable medical probability, whether Howell would have even survived surgery at 10:00 p.m. Sunday night, given her critical condition at that time. While Dr. Gentry could not say whether Howell was in septic shock at 1:30 p.m. upon her presentation to Humana or whether she was in irreversible septic shock at 10:00 p.m. Sunday, he did state that she was "very ill" and speculated that she might have been in the advanced stage of septic shock when she arrived at Humana. According to the undisputed expert testimony, the advanced stage of septic shock is irreversible and fatal.

Dr. Gentry's testimony about Howell's critically ill state when she was initially seen by Dr. Bradley, and the fact that a patient might reach a point where surgery should be performed, regardless of whether the patient survives, suggests that Howell's death resulted from her pre-existing condition, not from the failure to perform surgery. Dr. Gentry's testimony in this case that a delay in surgery for a patient with necrotizing fasciitis increases the risk of mortality does not mean that Howell, given her pre-existing condition, probably would have lived without any such delay. Such testimony is merely evidence of the odds on Howell's chances of survival. As we have stated, evidence of lost chance of survival is not probative of proximate cause and we are prohibited by the rule announced in *Kramer* from giving any weight to such evidence.

The character of Dr. Gentry's testimony is not altered by his statement based upon reasonable medical probability, that "there was a period at Southmore Hospital where Patricia Howell could have had a debridement and survived." Dr. Gentry could not specify a precise time at Humana when Howell could have been saved. The absence of such specificity by Dr. Gentry is crucial in this case because a substantial period of time elapsed between Howell's admission and Dr. Bradley's initial examination of Howell. It is entirely possible that the only time at Humana when Howell could have been saved was during the more than six hours that she was on the maternity ward—before she was seen by Dr. Bradley. In fact, Howell was in ICU for another two hours before she was seen by Dr. Bradley. Moreover, the fact that Howell "*could have been saved,*" does not mean that it was "more likely than not" that she would have been saved.

Further, Dr. Gentry never said, as appellees' imply, that death from necrotizing fasciitis is rare with appropriate treatment. Rather, Dr. Gentry testified that death from beta hemolytic strep infection is rare with appropriate treatment. Although it is not entirely clear, Dr. Gentry's reference was to common beta hemolytic strep infections, not

to the rare, virulent and massive infection that these patients developed from the liposuction. Even if his reference was to Howell and Rogers, Dr. Gentry never said that Howell or Rogers received inappropriate treatment or that Dr. Bradley did anything wrong. To the contrary, when presented with a hypothetical question based upon the course of Howell's treatment, Dr. Gentry stated that the physicians at Humana responded appropriately.

■ Appellees attempt to bolster Dr. Gentry's testimony with a statement he made to Mark Howell after Mrs. Howell had been transferred to St. Luke's. During his testimony, Mr. Howell described the statement as follows:

> "He made a statement to me that he wished he would have gotten to her sooner. He wished they would have moved her sooner, that he would have a better chance to save her."

Dr. Gentry's statement is not proper evidence of causation. It was hearsay and not admitted for the truth of the matter asserted, but only to show the emotional impact the statement had on Mr. Howell. *See generally*, TEX.R.CIV.EVID. 801, 802. The jury was so instructed upon defense counsel's proper hearsay objection. Even if the statement could be considered for the truth of the matter asserted, it was not probative of causation because it was also based upon mere possibility and lost chance. Dr. Gentry did not specify what he meant by "*sooner*" and the fact that Howell had a "*better chance*" if transferred to St. Luke's earlier does not mean that it was "more likely than not" that Howell would have survived if that had occurred. Hence, Mark Howell's testimony is not proximate cause evidence. Accordingly, Dr. Gentry's testimony amounts to "no evidence" of proximate cause.

■ Similarly, Dr. Alexander's testimony is not evidence of proximate cause. Although not cited by appellees, Dr. Alexander testified that mortality and morbidity will decrease under "Dr. Kaiser's unified ap-

proach" of treating all soft tissue infections the same, regardless of the layer of skin involvement, by administering broad spectrum antibiotics and performing immediate surgery to excise any necrotic tissue. He also testified that the mortality rate "approaches 100%" for a patient who has necrotizing fasciitis and does not undergo debridement. Testimony in the abstract about mortality rates is not evidence of proximate cause in this case. Dr. Alexander did not comment on the effect of Howell's pre-existing condition in causing her death nor did he express an opinion, based upon reasonable medical probability, that Howell would have lived or Rogers would have required less debridement if surgery had been performed Sunday night.

Appellees also cite testimony by Dr. Ersek. Although he acknowledged that Howell was suffering from the symptoms of irreversible septic shock, Dr. Ersek refused to say that Howell was in irreversible septic shock at 10:00 p.m. Sunday and in fact, concluded otherwise. He was the only expert to draw that conclusion despite the fact that he did not know what DIC meant. "DIC" stands for "disseminated intravascular coagulopathy" and is a condition in which the body's blood clotting factors are exhausted, thereby, causing internal bleeding. DIC is a common symptom of septic shock.

In any event, Dr. Ersek testified that Howell "may have been saved" if the nidus of her infection had been removed by surgery at 10:00 p.m. Sunday. He also testified that if Howell had gone to surgery at 10:00 p.m. Sunday, her "chances of survival would have been much better than they were twelve hours later." When asked to put a percentage on those chances, Dr. Ersek replied, "better than 50/50." Dr. Ersek further testified that Howell's chances would have been the same if she had gone to surgery at 3:00 a.m. or 8:00 a.m., and that those. chances would have decreased only slightly to "50/50" if she had gone to surgery at any later time. Again, that Howell "*may* have been saved" or that her "*chances for survival* were much better" if surgery had been performed Sun-

day night or early Monday morning is not probative evidence of proximate cause, but only of mere possibility and lost chance of survival. That fact is not changed by Dr. Ersek's assessment of "better than 50/50" odds on Howell's chances of survival. Dr. Ersek never stated, based upon reasonable medical probability, that Howell would have lived if surgery had been performed Sunday night or Monday morning. Furthermore, although *Kramer* speaks of a "greater-than-even" chance of survival, the Supreme Court did not adopt that measure as a "cut-off point" beyond which recovery is permitted. Rather, the court's concern was with maintaining a threshold, i.e., reasonable medical probability, for establishing causation in medical malpractice cases. Appellees did not surpass that threshold. Hence, we find no evidence that Dr. Bradley's acts or omissions proximately caused Howell's death.

With respect to Rogers, the evidence of causation is remarkably sparse. Appellees cite the following testimony of Dr. Ersek:

Q: I've got a few more questions, if I may, Doctor. With respect to Patricia Rogers, the burn care protocol you just described for me a moment ago—

A: Yes.

Q: —if we assume that protocol was not put into effect, how, if at all did that absence cause or contribute to Patricia Rogers' degree of injuries?

A: I believe that if she had been treated massively earlier that some of that—some more of that skin and subcutaneous tissue may have survived.

Q: All right. I'm not quite sure I understand what you mean by treated massively earlier. I—

A: Yes. If she'd had debridement, incision and drainage earlier, more of that skin may have survived.

Q: Let me ask my question a little bit differently. As I understood, your only criticism of the hospital with respect to Patricia Rogers was perhaps some burn

care protocol should have been implemented; correct?

A: Yes.

Q: If we assume you're correct in that regard, how did that—the absence of the burn care protocol, that issue, that fact alone, cause or contribute to any of Patricia Rogers' damages apart from everything else that was going on?

A: Upon declaration that this is a 50 percent body burn, since they have statistically a 50 percent mortality, this requires drastic and sudden treatment. And a patient will be given a massive fluid, treated at least with isolation. But had this been recognized, I believe that the patients would have been evacuated to a burn unit immediately or they would have gotten the biggest burn doctor in the area who have said, "holy mackerel, these patients are in septic shock," and the first thing we have to do is to remove the dead tissue, drain the abscess, try to identify the nidus for infection, remove the girdle, and at least take a look at the offending area, however big or small it may have been. And I believe that had that been done 8 or 12 hours earlier, that perhaps both of these patients would have fared better.

■ It is obvious from the record that this testimony was directed to the hospital's negligence with regard to the implementation of burn care protocol ordered by Dr. Bradley at 10:00 p.m. Sunday night. Notwithstanding that fact, Dr. Ersek's testimony that more of Rogers' skin and subcutaneous tissue *may have* survived or that *perhaps* Rogers would have *fared better* is only evidence of "mere possibility." In other words, it is possible, given her critical condition at the time she was first seen by Dr. Bradley, that there would not have been any more tissue destruction on Rogers if burn care protocol, including debridement, had been implemented at that time. Dr. Ersek never testified that Rogers probably would have required less treatment if surgery had been performed earlier. Indeed, the uncontradicted testimony of Dr. Ersek was that Rogers

would have required multiple debridements even if she had undergone surgery shortly after the blisters were found because necrotizing fasciitis almost always requires multiple surgeries.

Finally, Dr. Bradley did not admit, as appellees assert, that more debridement was required on Rogers because of any delay in diagnosis or treatment. When specifically asked, based upon the assumption that Rogers had necrotizing fasciitis at 10:00 p.m., whether "more debridement was necessary on Rogers because she had been allowed to continue with a progressive necrotizing soft tissue infection," he answered "no." When further asked, based upon the same assumption, whether it was his testimony that Rogers would have required at 10:00 p.m. or at 3:00 a.m., the same debridement that was ultimately required, Dr. Bradley stated that he had "no reason to say that." Dr. Bradley's answers to these questions did not constitute an admission that Rogers would have required more debridement because of a delay in diagnosis or treatment. At best, Dr. Bradley was uncertain.

Appellees emphasize that the jury could have reasonably inferred more debridement was necessary for Rogers not only because of Dr. Bradley's testimony, but also because of the progressive nature of the infection and the evidence, albeit disputed, of progression late Sunday night and early Monday morning. Other than testimony based upon speculation, there is nothing in the record about the actual amount of tissue destruction suffered by Rogers between the time she was seen by Dr. Bradley and the time she had surgery. Given the testimony of appellees' own expert that necrotizing fasciitis almost always requires multiple debridements and given Rogers' condition when was first seen by Dr. Bradley, it was impossible for Dr. Bradley and the experts, let alone the jury, to conclude with reasonable medical probability that Rogers required more debridement as result of Dr. Bradley's failure to recommend surgery. The testimony of Drs. Ersek and Bradley, when considered with the other evidence cited by appellees, is speculative

and not evidence of proximate cause. Hence, we find that appellees failed to offer any evidence that acts or omissions by Dr. Bradley was a proximate cause of the extensive debridement required on Rogers.

Having reviewed all of the evidence in the light most favorable to the jury's finding, we find no evidence to support the jury's finding that the negligence, if any, of Dr. Bradley was a proximate cause of Howell's death and Rogers' injuries. Therefore, we sustain Dr. Bradley's second point of error. Accordingly, we reverse that part of the trial court's judgment allowing recovery against Dr. Bradley and render judgment that appellees take nothing from him.[2] Because of our disposition of the aforementioned point of error, we need not address the remaining points presented by Dr. Bradley.

ELLIS, J., not participating.

---

**2.** As we observed, appellees did not raise cross-points of error or present argument with respect to the judgment rendered in favor of Dr. Muniz. Therefore, that portion of the judgment rendered in favor of Dr. Muniz remains undisturbed by any holding in this opinion. *See generally,* Tex. R.App.P. 52, 74. Further, because we have re-

versed and rendered judgment in favor of Dr. Bradley, he is no longer liable to appellees, either, individually, or joint and severally. That portion of the judgment rendered against Dr. Ramirez, individually, was not appealed and therefore, also remains undisturbed by any holding in this opinion.