Opinion issued May 22, 2003









     





In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00002-CV




ROBBIE AND PEGGY BIGGS, Appellants

V.

TERRY CLYBURN, M.D., AND ST. JOSEPH HOSPITAL, Appellees




On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 94-22466




MEMORANDUM OPINION

          Appellants, Robbie and Peggy Biggs, appeal from a take-nothing judgment
rendered after a jury trial in their medical malpractice suit against appellees, Dr. Terry
Clyburn and St. Joseph Hospital. We affirm.
BACKGROUND
1. Factual Background
          Appellant, Robbie Biggs, suffered an on-the-job injury on August 13, 1987,
during which he injured his neck, back, knee, and left shoulder. Biggs was treated
by Dr. Ray Fitzgerald from August 1987 to December 1987, during which time he
complained of pain in the left shoulder and was treated with steroid injections,
narcotic pain medicine, and physical therapy. Nevertheless, the pain in Biggs’s left
shoulder continued.
          In April 1988, Biggs first consulted with appellee, Dr. Terry Clyburn, an
orthopedic surgeon. Dr. Clyburn took an x-ray of Bigg’s left shoulder in April 1988,
which Dr. Clyburn noted as “show[ing] severe degenerative arthritis changes in the
shoulder.” In March 1989, Dr. Clyburn recommended a total shoulder replacement.
At that time, Dr. Clyburn noted that Biggs had severe pain and a reduced range of
motion in the left shoulder.
          Biggs saw Dr. Clyburn on a total of six occasions during the next three years,
each time complaining of shoulder pain. On March 11, 1992, Dr. Clyburn performed
a total shoulder replacement surgery at St. Joseph Hospital. During the surgery, Dr.
Clyburn inserted a Biomet shoulder prosthesis into Biggs’s shoulder joint. During
this initial surgery, Dr. Clyburn, as was his usual practice, did not cement the
prosthesis into the humerus bone. Instead he “machined” the bone out so the
prosthesis fit tightly down into the bone. The surface of the prosthesis was designed
in such a way to encourage the bone to grow to the prosthesis.
          On March 19, a little over a week after the surgery, during an office visit, Dr.
Clyburn noted that the shoulder appeared to be out of place. He attempted to
manually manipulate it back into position, but was unable to do so in the office. 
Therefore, on March 20, Dr. Clyburn placed Biggs under anesthesia at the hospital,
and manually placed the shoulder back into the joint. This procedure was a closed
procedure, and no surgical incision was made.
          On April 2, during an office visit, Dr. Clyburn noted in his records that he had
to repeatedly remind Biggs to refrain from moving his shoulder in certain positions,
which could cause a displacement of the joint. On April 6, a physical therapist also
noted that Biggs was attempting to move his shoulder in certain positions despite
warnings not to do so.
          On April 7, Biggs dislocated the shoulder while at physical therapy. The
physical therapist called Dr. Clyburn, who met them at the hospital, and surgically
opened the joint to place it into position and repair the damage done around the joint. 
During the April 7 surgery, Dr. Clyburn removed the prosthesis from the humerus
bone, rotated it slightly, and replaced it in the humerus bone. This time, he cemented
the prosthesis into place because the fit was not as precise after having been removed.
          On April 8, Biggs again dislocated the shoulder when going to physical
therapy. Dr. Clyburn consulted with Dr. Walter Lowe, at which time they determined
that a second revision surgery was necessary.
          On April 20, Dr. Clyburn and Dr. Lowe operated on Biggs’s shoulder. During
this surgery, they removed the glenoid component of the prosthesis and stabilized the
joint with a coracoid screw. They also placed a larger head on the humeral
component of the prosthesis, and a wire around the tuberosity of the humerus bone,
which had been slightly fractured during the first revision surgery.
          On April 24, Biggs was discharged from the hospital, but he returned on April
25 because the wound was seeping. Dr. Lowe, who was on call, admitted Biggs, at
which time he determined that the wound was infected. He opened the wound,
removed the coracoid screw, and cleaned the wound out.
          Laboratory tests revealed that the infection was caused by the bacteria,
enterobacter cloacae. Biggs then underwent a series of antibiotic treatments and
debridement procedures to clean the wound. He fired Dr. Clyburn on May 11
because he felt Clyburn had abandoned him because Clyburn was not available when
Biggs returned to the hospital with the infection on April 25. Dr. Lowe took over
Biggs’s case when Clyburn was discharged.
          In September 1992, Dr. Gary Gartsman removed the shoulder prosthesis
entirely. At the time, there was no enterobacter cloacae present in the wound.
2. Procedural Background
          Biggs sued Clyburn alleging that Clyburn was negligent in (1) performing an
unnecessary shoulder replacement surgery; (2) performing surgery under non-sterile
conditions; (3) failing to properly diagnose, care, and treat Biggs; (4) failing to
cement the prosthesis during the initial surgery; (5) failing to properly position the
prosthesis; (6) failing to timely remove the prosthesis; (7) failing to obtain Biggs’s
informed consent for any of the procedures; and (8) fraudulently, and, or, negligently
misrepresenting the surgery to Biggs. Biggs sued the hospital alleging that its
employees, specifically, a hospital nursing student, were responsible for
contaminating the screw and washer used in the second revision surgery, which led
to Biggs’s infection.
          The trial court granted a directed verdict in favor of the hospital. The trial
court also directed a verdict on Biggs’s informed consent claims against Dr. Clyburn
as to all procedures, except the first revision surgery on April 7. Finally, the trial
court directed a verdict on Biggs’s negligent misrepresentation claims against Dr.
Clyburn.
          The trial court submitted questions to the jury asking (1) whether Dr. Clyburn’s
negligence proximately caused Biggs’s injuries; (2) whether Biggs’s own negligence
cause his injuries; (3) whether Dr. Clyburn failed to disclose the risks associated with
the April 7 revision surgery; and (4) whether Dr. Clyburn committed fraud against
Biggs.
          The jury found Biggs 100% negligent and Dr. Clyburn 0% negligent. The jury
further found that Dr. Clyburn did not fail to disclose the risks associated with the
April 7 revision surgery and that Dr. Clyburn did not commit fraud. According to the
jury’s verdict, the trial judge entered a take nothing judgment. From this judgment,
Biggs appeals.       
ISSUES ON APPEAL
1. Broad-Form Submission
          In issues four, 13, and 14, appellants contend the trial court erred by submitting
a broad-form negligence question.


 Specifically, appellant contends the negligence
question submitted “fail[ed] to delineate or indicate what specific negligence the
Court required the jury to answer as to the action or conduct of Dr. Clyburn [or
Biggs] which was a proximate cause of injury to Biggs.” Appellant also argues that
the jury should have been asked to consider, in connection with the broad- form
liability question that was given, whether or not Dr. Clyburn committed any one of
seven different enumerated acts that appellant contends were negligent. Appellant’s
objections to the broad-form submission of negligence questions has been repeatedly
answered in favor of broad-form submission by this and other courts. See Crundwell
v. Becker, 981 S.W.2d 880, 884 (Tex. App.—Houston [1st Dist.] 1998, pet. denied);
Crawford v. Deets, 828 S.W.2d 795, 799-800 (Tex. App.—Fort Worth 1992, writ
denied). This case does not present the “extraordinary circumstances” necessary to
justify his proposed granulated jury submissions. See Texas Dept. Of Human Servs.
V. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (holding that a court must submit broad-form questions unless extraordinary circumstances exist). 
          We overrule issues four, 13, and 14.
2. Refusal to Submit Issue on “Negligent Misrepresentation”
          In issue two, appellant contends the trial court erred by refusing his “negligent
misrepresentation” claim to the jury. Appellant testified that he had the surgery
because that Dr. Clyburn misrepresented to him that his shoulder would fuse and he
would not be able to move his arm if the total shoulder replacement was not done. 
The gist of appellant’s allegation is that the surgery was unnecessary and that he
would never have had the surgery, but for Dr. Clyburn’s negligent misrepresentation
about the necessity of the surgery.
          A complaint that a physician performed an unnecessary surgery can form the
basis for a cause of action based on either negligence (misdiagnosis or mistreatment)
or battery. Neeble v. Sepulveda, 989 S.W.2d 390, 390 (Tex. App.—Houston [1st
Dist.] 1999, no pet.). In this case, a broad-form negligence question was submitted
to the jury, and the jury found that Dr. Clyburn was not negligent. There was no need
to submit a separate question relating to Dr. Clyburn’s alleged negligent
misrepresentation. See Neeble, 989 S.W.2d at 390.
          Accordingly, we overrule issue two.
3. The Directed Verdicts
          In issue one, appellant contends the trial court erred by directing a verdict in
favor of the hospital. In issue three, appellant contends the trial court erred by
directing a verdict on his claim that Dr. Clyburn did not obtain his informed consent
before the initial shoulder-replacement surgery.
          A directed verdict is appropriate when reasonable minds can draw only one
conclusion from the evidence. Collora v. Navarro, 574 S.W.2d 65, 68 (Tex. 1978); 
Smith v. Aqua-Flo, Inc., 23 S.W.3d 473,476 (Tex. App.—Houston [1st Dist.] 2000,
pet. denied); M.J. Sheridan & Son Co. v. Seminole Pipeline Co., 731 S.W.2d 620, 623
(Tex. App.—Houston [1st Dist.] 1987, no writ). In evaluating a directed verdict, we
determine if there was legally sufficient evidence that would support each of the
elements of the cause of action. Smith, 23 S.W.3d at 476; M.J. Sheridan, 731 S.W.2d
at 623. If Biggs introduced some evidence on each of the elements of his causes of
action, the trial court erred in granting the Hospital’s and Clyburn’s motions for
directed verdict. Smith, 23 S.W.3d at 476; see also M.J. Sheridan, 731 S.W.2d at
624. In evaluating the evidence, we examine it in the light most favorable to the
party against whom the verdict was rendered, and disregard all contrary evidence and
inferences. Qantel Bus. Sys., Inc. v. Custom Controls Co., 761 S.W.2d 302, 303-04
(Tex. 1988); Smith, 23 S.W.3d at 476. 
          A. Propriety of Directed Verdict for the Hospital
          The hospital contends the directed verdict in its favor was proper because
Biggs failed to introduce any evidence on the element of causation. Biggs, however,
contends that he introduced more than a scintilla of evidence to show that the post-operative infection suffered by Biggs was caused by “the hospital personnel’s
negligence in failing to sterilize the screw and washer [used in the second revision
surgery on April 20] or in contaminating the screw and washer while handling it so
that it was not sterile.” The gist of Biggs’s complaint is that, because he developed
an infection, there must have been a breach of sterile technique. The issue, thus, is
whether there was legally sufficient evidence to show causation. 
          In a medical malpractice case, the plaintiff is required to show evidence of a
reasonable medical probability that the injury was proximately caused by the
negligence of the defendant. Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508,
511 (Tex. 1995); Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988). To establish
proximate cause, a plaintiff must prove: (1) foreseeability, i.e., that the defendant
should have anticipated the danger that resulted from his or her negligence; and (2)
cause-in-fact, i.e., that the defendant’s negligence was a substantial factor in bringing
about the injury and without which no harm would have occurred. See Bradley v.
Rogers, 879 S.W.2d 947, 953 (Tex. App.—Houston [14th Dist.] 1994, writ denied). 
With regard to cause-in-fact, the plaintiff must establish a causal connection based
upon “reasonable medical probability,” not mere conjecture, speculation or
possibility. Id., citing Duff, 751 S.W.2d at 176. “Proof of mere possibilities will not
support the submission of an issue to the jury.” Duff, 751 S.W.2d at 176. While
expert medical testimony concerning the possible causes of the condition in question
is admissible to assist the trier of fact in evaluating other evidence in the case, a
possible cause only becomes “probable,” when in the absence of other reasonable
causal explanations, it becomes more likely than not that the injury was a result of its
action. Bradley, 879 S.W.2d at 954. This is the outer limit of inference upon which
an issue can be submitted to the jury. Id.
          In this case, although several expert witnesses testified that a breach in sterile
technique could cause the contamination of the screw and washer involved, there was
no evidence that such a breach in sterile technique occurred in this case. There was
no evidence that a breach in sterile technique was the more probable explanation for
Biggs’s infection. Dr. Carol Ewing, plaintiff’s expert witness testified that she
believed that the screw and washer were the source of the infection, but she could not 
tell “how [the infection] got there.” She could only “surmise,” that a breach in sterile
technique had occurred. Such surmise is insufficient evidence upon which to submit
the issue of causation to the jury.
          Accordingly, we overrule issue one.  
          B. Directed Verdict on Informed Consent Relating to Initial Surgery
          In issue three, Biggs argues the trial court erred in rendering a directed verdict
for Clyburn on the issue of informed consent as it related to the initial surgery. Even
though Biggs signed a surgical consent form, he argues the court should have
submitted the issue of informed consent.
          Biggs argues that even though he signed the consent form, he never read it,
and, as a result an issue about informed consent was presented. However, he
provides no authority to support his assertion that a plaintiff’s alleged failure to read
a consent form raises a fact issue on lack of informed consent. 
          It is undisputed by the parties that the Texas Medical Disclosure Panel has
established that a shoulder replacement is a procedure for which the Panel has
published a list of risks that must be disclosed in connection with the procedure. See
Tex. Rev. Civ. Stat. Ann. art. 4590i, § 6.04(b) (Vernon Supp. 2003). Such
disclosure creates a rebuttable presumption that the patient has given informed
consent. See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 6.07(a)(1) (Vernon Supp.
2003). Such a presumption can only be rebutted by evidence that (1) the patient’s
signature was forged, or (2) the patient lacked capacity to sign. Earle v. Ratliff, 998
S.W.2d 882, 891-92 (Tex. 1999).
          Biggs signed a form consenting to the shoulder-replacement surgery, which
detailed the risks associated with the surgery. He also initialed next to each specific
risk. There is no argument by either party that this disclosure does not comply with
the disclosure requirements mandated by the Texas Medical Disclosure Panel, and
there is no evidence in the record that Bigg’s signature on the disclosure was forged
or that he was incompetent to sign the disclosure. Therefore, Biggs has not raised a
fact issue on whether he has rebutted the presumption of informed consent.
          Furthermore, two of the disclosed risks were the ones about which Biggs now
complains–infection and subsequent removal of the implanted device. Thus, Biggs
was not injured by an undisclosed risk. See Jones v. Papp. 782 S.W.2d 236, 241
(Tex. App.—Houston [14th Dist.] 1989, writ denied). 
          The issue of whether Biggs would have agreed to the surgery had he not been
told that it was necessary to prevent his shoulder from fusing is distinct from the issue
of whether he was fully informed of the risks attendant to having the shoulder
replacement surgery. See Crundwell, 981 S.W.2d at 883-84. Therefore, the trial
court did not err when it granted Clyburn’s motion for a directed verdict on the issue
of informed consent as it related to the initial surgery.
          We overrule issue three.
4. Legal and Factual Sufficiency 
          In eight issues, appellant challenges the legal and factual sufficiency of the
evidence to support the jury’s answers (1) finding Biggs 100% at fault, (2) refusing
to find Dr. Clyburn at fault, (3) refusing to find a lack of informed consent as to the
first revision surgery, and (4) refusing to find fraud. When an appellant challenges
both the legal and factual sufficiency of the evidence, we must review the legal
sufficiency challenge first. Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401
(Tex. 1981).
          A. Standard of Review for Legal Sufficiency
          When an appellant attacks the legal sufficiency of an adverse finding of an
issue on which he did not have the burden of proof, he must show that there is no
evidence to support the adverse finding. Croucher v. Croucher, 660 S.W.2d 55, 58
(Tex. 1983). In reviewing a “no evidence” point, we consider only the evidence and
inferences that tend to support the finding, and disregard all evidence and inferences
to the contrary. Weirich v. Weirich, 833 S.W.2d 942, 945 (Tex. 1992). If there is
more than a scintilla to support the finding, the no evidence challenge fails. Stafford
v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987), overruled on other grounds, Price v.
Price, 732 S.W.2d 316 (Tex. 1987).
          When an appellant attacks the legal sufficiency of an adverse finding on issues
as to which he bore the burden of proof, he must demonstrate on appeal that the
evidence conclusively established all vital facts in support of the issue. See Sterner
v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989); Smith v. Central Freight
Lines, Inc., 774 S.W.2d 411, 412 (Tex. App.—Houston [14th Dist.] 1989, writ
denied). In reviewing this “matter of law” challenge, we use a two-prong test. See
W. Wendall Hall, Revisiting Standards of Review in Civil Appeals, 24 St. Mary’s
L.J. 1045, 1135 (1993). We first examine the record for evidence that supports the
finding, while ignoring all evidence to the contrary. See Sterner, 767 S.W.2d at 690. 
 If there is no evidence to support the finding, we then examine the entire record to
determine if the contrary proposition is established as a matter of law. Id. Only if the
contrary proposition is established as a matter of law will we sustain the issue. Id.
          B. Standard of Review for Factual Sufficiency
          In reviewing appellant’s factual-sufficiency challenges, we examine the entire
record to determine if: (1) there is some evidence to support the finding; (2) the
finding is so contrary to the overwhelming weight and preponderance of the evidence
as to be clearly wrong and manifestly unjust; or (3) the great preponderance of the
evidence supports its nonexistence. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986) (per curiam). We may reverse and remand only if we conclude that the
complained of finding or nonfinding is against the great weight and preponderance
of the evidence. Ames v. Ames, 776 S.W.2d 154, 158 (Tex. 1989). 
          C. Jury Finding that Biggs was Negligent
          In issues five and six, Biggs contends the evidence is legally, or alternatively,
factually insufficient to support the jury’s finding him negligent.
                    a. Legal Sufficiency 
          Because Biggs did not have the burden of proof on this issue, we review the
record to determine whether there was no evidence to support the jury’s finding.          First, Dr. Clyburn testified that there was nothing he could have done surgically
to improve Biggs’s shoulder and that there were two possible reasons the shoulder
was dislocating; either it was an act of God or “the patient himself was moving the
shoulder in directions and in positions that were causing the shoulder to dislocate.” 
Dr. Clyburn’s medical records showed that Biggs, in Clyburn’s presence, continued
to move his arm into prohibited positions, even after being warned to stop. The notes
of the physical therapist at Hermann Sports & Medicine Rehabilitation Center contain
similar notations regarding warnings to Biggs to stop moving his shoulder in certain
positions. Dr. Clyburn testified that, to a reasonable medical probability, Biggs’s
non-compliance with instructions caused the dislocation of his shoulder on more than
one occasion. Thus, we conclude there is some evidence to conclude that Biggs,
himself, was negligent and the evidence is legally sufficient to support the jury’s
finding.
                    b. Factual Sufficiency
          In support of his claim that the evidence on this issue is factually insufficient,
Biggs points to his own testimony, wherein he claimed that he never disobeyed Dr.
Clyburn’s orders and he did exactly what the physical therapist told him to do. Biggs
concluded that both Clyburn and the therapist “misrepresented the situation” in their
notes. The factfinder is the sole judge of the credibility of the witnesses and the
weight to be given their testimony. Leyva v. Pacheco, 358 S.W.2d 547, 549 (1962). 
The factfinder may believe one witness and disbelieve another. McGalliard v.
Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986). In this case, the jury was free to
believe Dr. Clyburn and disbelieve appellant. The evidence is not factually
insufficient.
          Accordingly, we overrule issues five and six.
          D. Jury’s Refusal to Find Dr. Clyburn at Fault
          In points seven and eight, Biggs contends the evidence is legally, or
alternatively, factually insufficient to support the jury’s refusal to find Dr. Clyburn
negligent. Because we have already sustained a finding that Biggs, himself, was
100% at fault, we need not address these issues, and decline to do so.
          Accordingly, we overrule issues seven and eight.
 
E. Refusal to Find Lack of Informed Consent as to the April 7, 1992 
Revision Surgery

          In issues nine and 10, Biggs contends the evidence is legally, or alternatively,
factually insufficient to support the jury’s refusal to find that Dr. Clyburn failed to
obtain Bigg’s informed consent before performing the April 7 revision surgery.



          In his brief, Biggs contends that “[t]here is no evidence that Dr. Clyburn
advised Biggs of the risks of the revision surgery which left the infected prosthesis
in place.” To the extent that Biggs is claiming that he was injured by infection as a
result of the April 7 surgery, we note (1) the record is undisputed that Biggs’s
infection developed after the April 20 surgery, not the April 7 surgery, and (2)
although the consent form did not contain all the specific risks associated with the
April 7 surgery, it did warn Biggs of the risk of surgical infection. As such, Biggs
cannot show that he was injured by an undisclosed risk. See Jones, 782 S.W.2d at
241.
          Accordingly, we overrule issues nine and 10.
          F. Jury’s Refusal to Find Fraud
          In points 11 and 12, Biggs contends the evidence is legally, or alternatively,
factually insufficient to support the jury’s refusal to find that Dr. Clyburn committed
fraud. Biggs alleged that Dr. Clyburn committed fraud by telling him that his
shoulder would fuse and that he would be unable to move his arm if he did not have
the shoulder replacement surgery. This statement, Biggs contends, was an intentional
misrepresentation designed to induce him to undergo the surgery.
a. Legal Sufficiency
          Dr. Clyburn testified that he never told Biggs that his bones would fuse
together if he did not have the surgery. Instead, Dr. Clyburn testified that he told
Biggs that his degenerative arthritis could eventually lead to a “frozen shoulder,” or
a shoulder that is “very, very stiff.” Dr. Clyburn testified that the shoulder “never
absolutely fuses, but it will get more and more and more rigid as times [sic] goes by
as this disease progresses naturally.” Thus, there is some evidence to support the
jury’s finding that Dr. Clyburn did not commit fraud by making an intentional
misrepresentation to Biggs regarding whether or not his shoulder would “fuse.”
                    b. Factual Sufficiency
          Biggs, however, testified that Dr. Clyburn “scared him to death” by telling him
that his shoulder would “fuse,” that it would be painful, and that he would not be able
to use his arm. Again, the jury, as factfinder was entitled to believe Dr. Clyburn’s
version of the conversation with Biggs and to disbelieve Biggs. See McGalliard v.
Kuhlmann, 722 S.W.2d at 697. The jury’s finding that Dr. Clyburn did not commit
fraud is not against the great weight and preponderance of the evidence.
 
 
 
          Accordingly, we overrule issues 11 and 12.
          We affirm the judgment of the trial court.
 
 
                                                             Sherry Radack
                                                             Chief Justice

Panel consists of Chief Justice Radack and Justices Nuchia and Hanks.