NO. 07-00-0108-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



MAY 10, 2000



______________________________




WILLIAM CASH LOVE, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE



_________________________________



FROM THE 64th DISTRICT COURT OF SWISHER COUNTY;



NO. B3252-9907CR; HONORABLE JACK MILLER, JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

ON MOTION TO SUSPEND OPERATION OF TEX. R. APP. P. 21.8


 Appellant William Cash Love applies by motion for this court to suspend operation
of Texas Rule of Appellate Procedure 21.8 (1) and to thereby extend the time for the trial
court to rule on his Amended Motion for New Trial before it is overruled by operation of
law. We deny the motion.

FACTUAL AND PROCEDURAL BACKGROUND

 Appellant alleges by a motion filed with the clerk of this court on April 13, 2000, that
sentence was imposed in this matter on January 29, 2000. He further alleges that notice
of appeal was timely filed, motion for new trial and amended motion for new trial were
timely filed, and that hearing was held on the amended motion for new trial on April 12,
2000. In his motion, appellant alleges that attorneys for the State and appellant agreed
to a schedule for presenting a transcript of the hearing on the motion for new trial and
briefs respecting positions of the parties to the trial court, and that the trial court accepted
the agreement in lieu of making a ruling on appellant's motion for new trial at the time of
the hearing on April 12, 2000. The agreed schedule provided for the trial court to rule on
appellant's amended motion for new trial sometime after May 15, 2000. 

 Rule 21.8(a) and (c) result in appellant's amended motion for new trial having been
overruled by operation of law upon the expiration of 75 days following January 29, 2000,
when sentence was imposed, unless the trial court ruled on the motion within such 75-day
period. The 75-day period expired on April 13, 2000. 



LAW

 In Oldham v. State, 977 S.W.2d 354 (Tex.Crim.App. 1998), the Court of Criminal
Appeals considered a cause in which the court of appeals suspended the provisions of
then Rule 31(a)(1) which required a motion for new trial to be filed within 30 days after
sentencing of the defendant. The suspension was under provisions of Rule 2(b), which
was the predecessor rule to current Rule 2. The suspension was based on "good cause"
in that appellant Oldham had allegedly been deprived of counsel in violation of her
constitutional rights, and had not filed a motion for new trial in regard to her forgery
conviction. The court of appeals abated and remanded the case so that appellant could
file a motion for new trial to assert the constitutional violation. Oldham v. State, 977
S.W.2d at 355-57. The Court of Criminal Appeals, in reversing the decision of the court
of appeals, stated that 

 In essence, the Court of Appeals used Rule 2(b) to extend the time limit for
the filing of the appellant's motion for a new trial some two years and eight
months, this being the time from the appellant's sentencing to the date of the
Court of Appeals' decision. . . . We believe the Court of Appeals was in error
to rely on Rule 2(b) as a mechanism to extend the time limits for the filing of
a motion for a new trial imposed by Rule 31(a)(1). . . . Rule 2(b) is in
essence an escape valve to be used by an appellate court when a case
becomes unduly stalled or delayed in the appellate process due to
procedural rules, and the interests of justice compel speeding up the
process; although Rule 2(b) may be used to shorten the time limits when
justice so requires, it should not be used as a method to lengthen procedural
time limits absent truly extraordinary circumstances, even in an effort to
protect the substantive rights of litigants. Oldham v. State, 977 S.W.2d at
356, 360.


 In State v. Riewe, No. 699-99 (Tex.Crim.App. Mar. 8, 2000), the court reiterated its
statements in Oldham to the effect that Rule 2 is not to be used to enlarge timeframes
established by the appellate rules for appeals: "[Rule 2] was not intended to be used to
lengthen procedural time limits, even in an effort to protect the substantive rights of
litigants."

ANALYSIS

 Granting appellant's motion would expand the time limits established by the TRAP
for appellant's appeals process. As Rule 2 has been interpreted in Oldham and Riewe,
we cannot suspend the operation of Rule 21.8 and extend the time for the trial court to rule
on appellant's amended motion for new trial under the circumstances presented by
appellant. Thus, assuming appellant, the State, and the trial judge agreed on the proposal
as described in appellant's motion, we still must, and therefore do, deny appellant's
motion. 

 Per Curiam


Do not publish.

1. Further references to the rules of appellate procedure will be by reference to "Rule"
or "TRAP."


ext-decoration: underline">See Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 400 (Tex. 1993). 
To establish proximate cause, the plaintiff must prove (1) foreseeability, and (2)
cause-in-fact. See Leitch v. Hornsby, 935 S.W.2d 114, 118-19 (Tex. 1996). The cause-in-fact element of proximate cause requires proof that the alleged negligence was a
substantial factor in bringing about the harm, and without which the harm would not have
occurred. See Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995). With
regard to cause-in-fact, the plaintiff must establish a causal connection between the
defendant's negligence and the injuries based upon a reasonable medical probability. Id.
at 511. Opinion evidence relied on as proof must be based on more than possibilities,
speculation and surmise. See Schaefer v. Tex. Employers' Ins. Ass'n, 612 S.W.2d 199,
202-05 (Tex. 1980). In evaluating opinion evidence we look to the basis of the expert's
opinion, and not the bare opinion alone. A claim cannot stand or fall on the mere ipse dixit (5)
of a credentialed witness. See Burrow v. Arce, 997 S.W.2d 229, 235 (Tex. 1999). 
Whether expert testimony on causal connection rests upon reasonable medical probability
must be determined by the substance and context of the testimony rather than semantics
or use of a particular term or phrase. See Burroughs Wellcome Co. v. Crye, 907 S.W.2d
497, 500 (Tex. 1995). If an expert's opinion is based on assumed facts that vary materially
from the actual, undisputed facts, the opinion is without probative value and cannot support
a verdict or judgment. Id. at 499-500. LEGAL SUFFICIENCY OF THE EVIDENCE

 In reviewing legal sufficiency or "no evidence" complaints, we may consider only the
evidence and inferences that tend to support the finding and must disregard all contrary
evidence and inferences. See Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444,
450 (Tex. 1996). A no evidence complaint is to be sustained when the record shows one
of the following: (a) a complete absence of evidence to prove a vital fact; (b) the reviewing
court is barred by rules of law or evidence from giving weight to the only evidence offered
to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. See
Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998). If more than a scintilla
of evidence exists, the evidence is legally sufficient. See Lee Lewis Constr., Inc. v.
Harrison, 70 S.W.3d 778, 782 (Tex. 2001). More than a scintilla of evidence exists if the
evidence furnishes some reasonable basis for differing conclusions by reasonable minds
about a vital fact's existence. Id. at 782-83.



ISSUE THREE: PROXIMATE CAUSE 

 By issue three, Dr. Archer challenges the legal sufficiency of the evidence of
proximate cause in two areas. Both areas challenge the evidentiary support for a cause-in-fact finding. 

 First, she asserts there is no evidence that Anita would have done Kegel's exercises
if they had been offered to her. Second, she alleges there is no evidence that even if Anita
had done the exercises, Anita, to a reasonable medical probability, would have improved
to the extent that surgery would not have been necessary. We will address the second
part of the issue. In doing so, we will assume, without deciding, that legally sufficient
evidence exists to support a finding that Anita would have tried and performed Kegel's
exercises if they had been discussed by Dr. Archer. 

Would Anita's Use of Kegel's 

Have Avoided Surgery?


 Dr. Archer approaches this aspect of her legal sufficiency evidentiary challenge in
two ways. We will address them in the order presented. 

 First, Dr. Archer references her own testimony that she did not offer Kegel's to Anita
in January, 1995, because the exercises would not have corrected the anatomical defects
of the cystourethrocele and rectocele. She maintains that those defects and the SUI were
corrected by the surgery which she planned, explained to Anita, Anita consented to and
Dr. Archer performed; and there is no evidence that the exercises would have corrected
those anatomical defects. 

 The Warrens respond that Anita agreed to surgery in order to correct her SUI and
not because of the physical defects. They argue that Dr. Archer's position is a
misstatement of their theory of liability.

 Dr. Archer testified that she would not recommend surgery for a second degree
cystourethrocele and a first degree rectocele if the patient was not having problems and
was living with the defects, provided that the patient's SUI symptoms could be corrected
without surgery. She had diagnosed Anita with a second degree cystourethrocele and a
first degree rectocele. The Warrens do not contend that they alleged or offered proof that
Kegel's would have corrected the cystourethrocele or the rectocele. They contend that
their theory, as alleged and proved, was that Kegel's probably would have cured or
improved Anita's SUI to the extent that she then would have been within the group of
patients on which Dr. Archer testified she would not have performed surgery. 

 We agree with the Warrens. We do not perceive their allegations against Dr.
Archer to have been that Kegel's would have corrected the cystourethrocele and the
rectocele, as Dr. Archer has framed the allegations. (6) This part of Dr. Archer's issue three
is overruled. 

 Second, Dr. Archer urges that Dr. Rosenfeld's testimony as to causation consisted
of general statistics which addressed percentages of patients whose SUI was "improved
or cured" by the use of Kegel's, but which did not differentiate between (1) percentages of
patients whose SUI was cured or improved to the extent and duration that surgery was not
necessary, and (2) patients whose SUI was improved, but not to the extent or for the
duration that surgery was not necessary. Dr. Archer also maintains that the Warrens
offered no evidence that Anita, as an individual with her particular conditions, to a
reasonable medical probability, would have been one of the group of patients whose SUI
was cured or improved to the extent or for the duration that surgery was not necessary. (7)

 In responding to this part of the issue, the Warrens refer us to (1) Dr. Rosenfeld's
testimony that "There is absolutely no reason that this particular patient could not be
helped to the tune of maybe 60 or 80 percent improvement or of pure continence by the
use of some well-explained nonsurgical treatment such as Kegel exercises"; (2) Dr.
Rosenfeld's reference to Department of Health Guidelines which "strongly recommended"
pelvic muscle exercises (such as Kegel's) for SUI and reported statistical studies showing
"54 to 60 percent reduction in incontinent episodes"; (3) Dr. Archer's testimony that Kegel's
exercises strengthen the pelvic floor muscles, help keep the bladder in place and lessen
symptoms in patients with mild SUI; (4) Dr. Archer's recognition of authorities citing high
percentages of improvement or cure of SUI following an intensive program of physical
therapy over a three-month period of time; and (5) Dr. Rosenfeld's testimony that studies
concerning the effects of Kegel's exercises on women with SUI were studies of women
who had the same or a similar condition as Anita had when she presented to Dr. Archer
in 1995. 

 We will examine these areas for evidence that, to a reasonable medical probability,
the prescribing of Kegel's by Dr. Archer and use of Kegel's by Anita would have improved
her incontinence to the extent that surgery would have been avoided. 

 First, as to Dr. Rosenfeld's testimony quoted above referencing "this particular
patient," the testimony did not reference Anita or her individualized situation. The line of
questioning was objected to initially by Dr. Archer's counsel when Anita was referred to in
a question. Following the objection and the trial court's response, Anita's counsel
rephrased his question and referenced patients in general, and not Anita in particular. 

 Moreover, the question and answer dealt with cure or improvement of SUI
symptoms, but did not differentiate between the two possible outcomes. Nor did the
question and answer differentiate between patients who improved to some extent or for a
temporary time with Kegel's, but for whom surgery was still necessary to reach an
acceptable reduction in SUI, and those who were cured or improved with Kegel's to the
extent and for the time duration that they did not require surgery to reach such a level. The
cited portions of the record do not, therefore, indicate to a reasonable medical probability
that even if Kegel's had been offered to, accepted by and "well-done" by Anita, and Kegel's
had improved her incontinence, that she would have been cured or reached a level and
duration of improvement such that surgery would have been avoided, as opposed to
merely having some unspecified level or time period of improvement but still having fallen
within the group of patients for whom surgery would have been necessary to reach their
acceptable level of incontinence. 

 The second area of evidence referenced by the Warrens is Dr. Rosenfeld's
response when he was asked his opinion of whether, in January, 1995, Kegel's exercises
were a viable option that should have been discussed and tried with Anita. He opined that
he thought the exercises should be tried at any time,

 . . . but there are studies in this particular book that indicate that regardless
of whether the patient had severe or moderate SUI, those people got good
results with well-done Kegel's exercises. They improved to the point that
they did not need surgery. . . and the answer to your question, that if - - that
the patient is never at a point - - never at a point where you should not try a
conservative method of holding this urethra up and trying to avoid surgery. 
Because if you have a 60 or 70 percent chance of avoiding surgery, why
not? 

 

 Dr. Rosenfeld then referenced a study in a book he was referring to which indicated
two treatment groups with a 54 to 60 percent reduction in incontinent episodes. He did not
testify that the referenced study suggested a percentage of patients who were either cured
of SUI without surgery, or were improved to the extent that surgery was not necessary. His
statement that "They improved to the point that they did not need surgery" could be
interpreted to imply a study wherein 100 percent of patients improved to the point that they
did not need surgery. If Dr. Rosenfeld intended such an implication, the implication would
be in the nature of an ipse dixit statement because no other evidence supported the
statement. To the contrary, the statement stands in direct conflict with the remainder of
his testimony when considered as a whole, and studies he cited and relied on as
authoritative. See Arce, 997 S.W.2d at 235. For example, Dr. Rosenfeld's testimony
elsewhere in the record is that Kegel's exercises are performed for the purpose of (1)
strengthening muscles in a woman's pelvic floor to prevent her bladder from dropping, or
dropping further, out of its correct anatomical position, and (2) strengthening muscles
supporting the urethra so its ability to fully close and remain closed is enhanced. He
referenced studies which reported that the strengthening of pelvic muscles via Kegel's
exercises, along with educational aspects of performing the exercises, resulted in certain
percentages of females with SUI having decreased incontinence or becoming completely
continent. The studies reported, however, and Rosenfeld opined, that some females with
SUI did not improve with use of the exercises. He specifically testified at one point that
certain patients had no improvement from the exercises, even if properly done, because
their muscles could not be tightened beyond a certain point. 

 His statement, "Because if you have a 60 or 70 percent chance of avoiding surgery"
(emphasis added), assumed that Anita had a 60 or 70 percent chance of avoiding surgery
via "well-done" Kegel's exercises. The assumption does not comport with (1) the studies
he elsewhere referenced, (2) the balance of the opinions he offered which addressed only
cure or improvement by the use of Kegel's without a differentiation between patients who
improved and avoided surgery and patients who improved but did not avoid surgery, or (3)
his testimony that the most important factor in a patient's improvement or cure through the
prescription and performance of Kegel's was the confidence expressed in the exercises
by the treating physician. As to the latter, Dr. Rosenfeld was firm in his opinion that if the
prescribing physician did not express confidence in the exercises as a mode of treatment,
and communicate such confidence to the patient, then the patient's use of Kegel's was not
going to have a successful result. 

 Dr. Rosenfeld was present in the courtroom during Dr. Archer's testimony. Dr.
Archer testified that her experience with Kegel's was not positive; she did not have
confidence that, given Anita's condition, the exercises would improve Anita to the point that
surgery could be avoided; she believed Kegel's would not work for Anita; and her lack of
confidence that the exercises would work for Anita was the reason she did not discuss
them in January, 1995. 

 Dr. Rosenfeld agreed that the reported percentages of females whose SUI was
improved or stopped completely by use of Kegel's varied by study, and that in the medical
literature on the subject, "everybody cites a different percentage based on their own
theory." He acknowledged that some studies (1) reported improvement rates of less than
50 percent, and (2) reported that only a small number of patients studied were able to
avoid surgery by using Kegel's. He testified that if Kegel's exercises were effective "it may
be" that they would be a temporary solution, or they may be a permanent solution, but each
patient has to be dealt with individually. 

 On cross-examination Dr. Rosenfeld was asked specifically if he could give a
percentage as to the number of patients improved by Kegel's to the degree that they could
avoid surgery. He did not give such a percentage. Rather, he reiterated an earlier
statement: "I quoted figures that 60 to 80 percent of the patients are either markedly
improved or are continent, meaning that they are holding their urine. Now, that - - you
could imply from that, that, say, 20 percent of them to that point may not be improved but
a little bit or not at all." See Bradley v. Rogers, 879 S.W.2d 947, 956 (Tex.App.--Houston
[14th Dist.] 1994, writ denied). 

 Dr. Rosenfeld testified consistently that each patient had to be dealt with
individually. When he was asked directly what characteristics or description fit the kind of
patient that Kegel's would not work on, he responded, "Well, I'm not sure. The reason that
Kegel's exercises do not work may be on a basis of a variety of things. . . ." Dr. Rosenfeld
testified that surgery was a viable option if a patient's SUI was serious enough that in the
patient's mind the SUI was socially unacceptable. He did not opine as to what level of
improvement was necessary to reach such a state of socially-acceptable SUI, he did not
reference Anita's particular circumstances or level or duration of improvement which
probably would have occurred, nor did he articulate standards by which to predict, by either
individualized factors or a general percentage, which patients who used and had
improvement from Kegel's, to a reasonable medical probability, would remain with socially-unacceptable SUI requiring surgery for cure. 

 Dr. Rosenfeld's response referenced by the Warrens was to the question of whether
Kegel's should have been discussed and tried with Anita. It does not purport to be an
opinion that, to a reasonable medical probability, Anita had a 60 to 70 percent chance (or
probability) of avoiding surgery. It assumes a state of evidence at variance with undisputed
facts and Dr. Rosenfeld's own direct opinions. Such testimony has no probative weight as
evidence that, to a reasonable medical probability, surgery would have been avoided had
Kegel's been discussed with and performed by Anita . See Burroughs Wellcome Co., 907
S.W.2d at 499-500.

 Dr. Rosenfeld's testimony cited by the Warrens amounts to no more than a scintilla
of probative evidence that had Anita used Kegel's, she would, to a reasonable medical
probability, have avoided surgery. Such testimony is legally insufficient evidence of
proximate cause. See Ellis, 971 S.W.2d at 409. 

 The third and fourth areas referenced by the Warrens relate to Dr. Archer's
testimony on cross-examination in which she acknowledged that Kegel's are designed to
strengthen the pelvic musculature, improve SUI symptoms, and that some studies show
a high rate of improvement or cure of SUI via the patient's performance of Kegel's. Dr.
Archer, however, did not testify that, to a reasonable medical probability, Anita would have
avoided the need for surgery if Kegel's had been prescribed for her and if she had
performed them properly. To the contrary, Dr. Archer consistently maintained that she
doubted the benefit of Kegel's in SUI cases beyond the mild stage and Anita's particular
situation was one in which Dr. Archer's opinion was that Kegel's would not have prevented
the need for surgery. Dr. Archer's referenced testimony is not evidence that if she had
offered Kegel's to Anita, and Anita had performed them, that Anita would have avoided
surgery to a reasonable medical probability. See Glenn v. Prestegord, 456 S.W.2d 901,
902 (Tex. 1970).

 Finally, the Warrens reference Dr. Rosenfeld's testimony that, except for some
percentage of women who had congenital defects, all women who had SUI had urethral
deviations which caused their SUI and that studies describing the effects of Kegel's
exercises on women with SUI were studies of women who had a compromised urethral
condition which was either the same as or similar to Anita's condition when she presented
to Dr. Archer in 1995. As we have discussed above, such testimony is not evidence that
Anita, to a reasonable medical probability, was one of the SUI patients who would be
improved by "well-done" Kegel's to the extent that surgery would not be required. If all
women who had SUI had a compromised urethra such as Anita, then according to the
evidence, performance of the exercises by the similarly-situated women (1) would not
improve a percentage of the women, (2) would improve some percentage, but the
improvement would not be enough to avoid surgery, (3) would improve some percentage
enough to avoid surgery, and (4) would cure some percentage. But, predicting to a
reasonable medical probability which particular patients would fall into which category
could logically only be based on the individual circumstances and conditions of each
particular patient. There is an analytical gap between the referenced testimony and the
conclusion that Anita would have avoided surgery to a reasonable medical probability. See
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 728 (Tex. 1998); Bradley, 879
S.W.2d at 956-57. The referenced testimony is not legally sufficient evidence to support
a finding that to a reasonable medical probability Anita would have avoided surgery by the
use of Kegel's.

 In sum, Dr. Rosenfeld and the other physicians agreed that each patient must be
considered individually. Dr. Rosenfeld was unable to set out any criteria which could be
used to identify patients who would not be improved or cured by Kegel's, such as patients
with muscles which simply could not be strengthened by the exercises. The evidence
showed that statistically, well-done Kegel's would cure some patients of SUI so that
surgery would not be necessary; would not improve some patients at all and surgery would
still be necessary; and would improve SUI symptoms in some patients to some degree and
for some time duration in which case surgery might or might not be necessary, depending
on the degree of improvement, and whether the improvement was temporary or
permanent. Such general statistical studies are not legally sufficient evidence that, to a
reasonable medical probability, Anita's SUI would have been cured or improved by Kegel's
to the extent that surgery would not have been necessary. See Gammill, 972 S.W.2d at
728; Havner, 953 S.W.2d at 720, 724. 

 Because the evidence is legally insufficient to support a finding that, to a reasonable
medical probability, Anita would have avoided surgery by the use of Kegel's, issue 3 is
sustained. See Ellis, 971 S.W.2d at 409. Our disposition of issue 3 is dispositive of the
appeal and we do not consider any other issues. See Tex. R. App. P. 47.1. 


 The judgment of the trial court is reversed. Judgment is rendered that the Warrens
take nothing. 

 


 Phil Johnson

 Chief Justice 

1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment.
2. The term cystourethrocele was used interchangeably with the term urethrocele at
trial. An urethrocele is a prolapse of the urethra into the vagina. 
3. The Warrens' expert, Dr. Philip Rosenfeld, was not critical of Dr. Archer's choice
of surgical procedures. Nor did he, at trial, attribute Anita's leg pain to negligence by Dr.
Archer in performing the surgery.
4. Testimony also referenced other conservative measures of treatment such as
biofeedback, weighted cones and electrical stimulation. The testimony, however, focused
on Kegel's exercises. We will use the term "Kegel's" or "exercises" to encompass all of the
conservative measures referred to. 
5. The term "ipse dixit " means "something asserted but not proved" and is literally
translated "he himself said it." See Marvelli v. Alston, 100 S.W.3d 460, 478 n.6 (Tex.App.--Fort Worth 2003, no pet. h.), citing BLACK'S LAW DICTIONARY 833 (7th ed.1999). 
6. Although, as we noted previously, Anita testified that she believed she was having
surgery to correct the problem of her bladder having fallen following her prior hysterectomy.
7. Because of our disposition of issue three, we do not consider either the opinion
testimony of Dr. Archer and her expert witnesses, Drs. Delbert Johns and Robert
Henderson, or the Warrens' objections to the opinions. The Warrens lodged reliability
objections to admission of the opinions expressed by each of the three physicians as to
the effect Kegel's would have had for Anita. See E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549 (Tex. 1995). However, the opinions are instructive as to Dr.
Archer's appellate contentions. Each of the three doctors considered individualized factors
in formulating their opinions as to whether Anita probably would have avoided surgery by
using Kegel's. Such individualized factors included Anita's age, her history of having
delivered three children, her status as a long-time smoker and the effects of smoking on
pelvic tissues, her height, her weight, her body structure and the types and degrees of
anatomical defects she had.