

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00319-CV

_____

MARIO OROZCO RANGEL, Appellant

V.

AMY LEDGISTER, Appellee

---

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 20-5256-442

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellee Amy Ledgister sued Appellant Mario Orozco Rangel for negligence and negligence per se following a car collision. Rangel stipulated to liability, and the case proceeded to a jury trial on damages. The jury returned a verdict in favor of Ledgister, awarding, among other things, $1,806,744 for future medical expenses. In one issue, Rangel argues that the evidence does not support the jury's award of future medical expenses "because there was no evidence, or alternatively, factually insufficient evidence, that the car accident caused any or all of [Ledgister's] future medical expenses." Because the evidence is both legally and factually sufficient to support the jury's award of future medical expenses, we will affirm.

## II. BACKGROUND

### A. Ledgister's Lawsuit and Rangel's Stipulation of Liability

In July 2020, Ledgister filed a lawsuit against Rangel, asserting claims of negligence and negligence per se.[1] Ledgister alleged that on February 11, 2019, her vehicle was stopped at a stop sign facing east at the intersection of North Shore Place and Interstate 35 in Denton County. According to Ledgister, Rangel was traveling south on the Interstate 35 service road at that same time, and he turned onto North

---

[1]Ledgister also brought claims against Rangel on behalf of her minor child, and Ledgister's husband brought claims against Rangel. Those claims were later nonsuited.

Shore Place and struck her vehicle. Ledgister claimed that she was injured in the collision. Rangel answered Ledgister's lawsuit, and he later stipulated to liability for the accident.

## B. Trial Testimony

The case proceeded to a jury trial on Ledgister's negligence claim. Ledgister called three witnesses at trial: herself, Dr. Dennis Gumbrecht, and Dr. Thomas Garzillo. Rangel did not call any witnesses.

### 1. Ledgister's Testimony

Ledgister, who was thirty-eight years old at the time of trial, testified that eleven days after the collision, she sought chiropractic treatment at Texas Healthcare Neck & Back for neck and back pain. Ledgister had never before sought chiropractic treatment. After receiving treatment at Texas Healthcare, Ledgister stated that her "back pain was much better," but there "was still . . . neck pain that was causing [her] discomfort."

In April 2019, an MRI was taken of Ledgister's cervical spine. Ledgister testified that the MRI revealed three herniated discs.[2] Later, Ledgister sought consultation for her pain at the Spine and Orthopedic Academic Research Institute (SOAR) and from Gumbrecht. According to Ledgister, she did not receive any

---

[2]We note that, in the record, "disc" is sometimes spelled "disk." Our opinion reflects the spelling as it appears in the record.

treatment following those consultations because she "didn't have the money for treatment."

Ledgister testified that the pain in her neck had affected her daily living. She stated that she had difficulty sleeping, that her neck pain had limited her ability to play with her daughters, and that she is no longer able to provide lash extensions for clients.[3] In addition, she testified that "progressively[,] the pain had gotten worse."

## 2. Gumbrecht's Testimony

Gumbrecht testified that he had a medical degree, was licensed to practice medicine in Texas, and was an anesthesiologist and pain doctor who was "double board certified" in anesthesiology and interventional pain management. Gumbrecht had been treating patients like Ledgister for spinal injuries since 2017 and performed a "new patient consult" for her in May 2021. Records from that consult, which were admitted into evidence, indicate that Ledgister was seeking "consultation for injuries sustained in a MVA on 2/11/19" and that she had been treating and participating in "conservative care." Gumbrecht noted that Ledgister complained of "moderate to severe" neck pain, "moderate to severe" upper back pain, and "mild" lower back pain. He indicated that these pains were "new [and] onset since date of injury."

---

[3]Ledgister testified that she was the owner of "an aesthetician-type establishment" and that prior to the accident, she did lash extensions for clients "where you're bent over and you're looking down" and taught students how to do lash extensions. Following the accident, she only teaches students because providing the lash extensions "takes a toll on [her] body."

4

Gumbrecht performed both a general and musculoskeletal examination on Ledgister. When he did the examinations, he found paresthesias radiating to the left shoulder blade. As part of those examinations, he also performed Spurling's Maneuver and facet loading on Ledgister. Gumbrecht described Spurling's Maneuver as a maneuver where he turns the patient's neck and applies pressure on "the axis, like the cap of [the] head." He explained facet loading as a test where he touches or pushes on the joints of the spine to make them offset one another. Gumbrecht testified that Ledgister had a "positive result" on both Spurling's Maneuver and facet loading and that those results aided his diagnosis.

Gumbrecht testified that he also reviewed a report from Ledgister's April 2019 MRI prepared by Dr. Chad Porter, M.D., who was board certified by the American Board of Radiology and fellowship trained in musculoskeletal and spine radiology. That report reflected that Ledgister had three herniated discs: a 1.5 millimeter protrusion between the C3 and C4 vertebrae, a 1.8 millimeter protrusion between the C4 and C5 vertebrae, and a 2.0 millimeter protrusion with a 4.0 millimeter central annular fissure between the C5 and C6 vertebrae.[4]

Due to the unresolved neck pain with radicular symptoms, even with conservative treatment, Gumbrecht recommended that Ledgister receive "a cervical epidural steroid injection to help decrease the inflammation and promote healing of

---

[4]Gumbrecht stated that "an annular fissure . . . is active, sharp inflammation, almost like a tear in the disc, itself."

5

the disc injury." Using a spine model, he explained to the jury how a disc injury affects the spine and how spine injections are performed. Gumbrecht estimated that the cost of each injection would be $9,752.09 and that, based on reasonable medical probability, Ledgister would need one injection per year for the rest of her life.

Gumbrecht also reviewed records from SOAR. The records reflected that Ledgister came "in for a chief complaint of Neck Pain, involving the cervical spine. This occurred in the context of being involved in [a] motor vehicle accident on 02/11/2019 and is worse during activity." After diagnosing her with cervicalgia, cervical herniated disc, muscle spasm, and cervical facet joint syndrome, SOAR's Dr. Elijah Hothem, M.D., indicated that Ledgister needed "Bilateral Cervical (C3-C4, C4-C5, C5-C6) Facet Injections."

Gumbrecht agreed with Hothem that Ledgister was a "candidate for cervical facet injections." He explained what a facet joint injection was and that the reasonable cost of each facet joint injection is $27,000. Gumbrecht further testified that, based on reasonable medical probability, Ledgister would need a facet joint injection at least once a year for the rest of her life.

As to causation, the following exchanges occurred between Gumbrecht and Ledgister's attorney:

Q.     . . . . Under additional notes, it says the injuries and symptoms are directly related to the aforementioned incident. You see that, sir?

A.     Yes.

6

> Q. Is that your opinion based on reasonable and medical probability?
>
> A. Yes.
>
> Q. Do you have -- are you -- do you have the same or a different opinion today speaking about this injury today with respect to the injuries being related to this collision?
>
> A. My opinion is the same.
>
> . . . .
>
> Q. . . . Dr. Gumbrecht, you stated that in all reasonable and medical probability, that the objective findings above, the injuries sustained and resulting symptoms are the direct result of the incident of 2/11 of '19. And I think you said that your testimony has not changed since the issuance of this report.
>
> A. It's not changed.

Gumbrecht and Ledgister's attorney also discussed differential diagnosis[5] as it applied to Ledgister:

> Q. What is differential diagnosis with respect to the medical community? What does that mean to y'all?

---

[5]A "differential diagnosis" is a "clinical process whereby a doctor determines which of several potential diseases or injuries is causing the patient's symptoms by ruling out possible causes—by comparing the patient's symptoms to symptoms associated with known diseases, conducting physical examinations, collecting data on the patient's history and illness, and analyzing that data—until a final diagnosis for proper treatment is reached." *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604–05 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *see Transcont. Ins. Co. v. Crump*, 330 S.W.3d 211, 216 (Tex. 2010) ("This is a routine diagnostic method used in internal medicine whereby a treating physician formulates a hypothesis as to likely causes of a patient's presented symptoms and eliminates unlikely causes by a deductive process of elimination.").

A. When you are still performing your evaluation for a patient, a differential diagnosis is kind of a "if," if statements. It could be a list of diagnoses that are likely or possible so you don't just put your thumb down on one diagnosis right away. So it's almost like a working, fluid diagnosis. So you list maybe three to five different types of diagnoses for a patient.

Q. And with respect to Amy Ledgister, did you rule out all of the possible issues that she had or could have had until you came to a final probable conclusion as to what her injuries are and what caused them?

A. With -- with her MRI, that aided in her diagnosis, yes.

Q. And what is the differential diagnosis after ruling out all of the possibilities? What is more likely than not the cause of the cervical herniated discs at C3-4, C4-5, and C5-6?

A. So you're asking what caused it? Her motor vehicle accident.

Q. Have you read any medical literature of any doctor that has treated or seen Amy that has a different opinion than yours?

A. No.

Gumbrecht testified that his answers to all of the questions that were asked were based on reasonable medical probability.

### 3. Garzillo's Testimony

Garzillo stated that he was a certified life care planner with a sub-certification in medical cost projections and that he had formerly practiced for twenty-five years as

8

a doctor of chiropractic medicine. As a doctor, he had had approximately 11,000 patients, including ones who sustained herniated disks in the spine.

At trial, Garzillo testified as an expert witness in two capacities—as a certified life care planner and as a doctor of chiropractic. When testifying as a life care planner, his trial testimony was "based on the accepted methodologies in [his] field as a certified life care planner based on reasonable probability." When testifying as a doctor, his trial testimony was "based on reasonable and medical probability to a degree from the field of chiropractic medicine."

Garzillo had reviewed Ledgister's medical records from Texas Healthcare and prepared a prognosis-based medical cost projection report for Ledgister.[6] Garzillo testified that Ledgister had a life expectancy of eighty-three years and that the difference between her life expectancy and her age at the time of trial was forty-five years. In preparing his report, which was admitted into evidence, he considered a number of studies indicating that "[w]hen you have a herniated disk, what's going to happen to that disk over time is that it's going to break down."

In his report, Garzillo gave projections for the long-term future care required by Ledgister for her injuries sustained in the car collision with a low range of $1,576

---

[6]Garzillo never met with Ledgister in person but reviewed medical records. *See Silva v. Diaz*, No. 05-20-00443-CV, 2022 WL 3500008, at *9 (Tex. App.—Dallas Aug. 18, 2022, no pet.) (mem. op.) ("In fact, in formulating his opinions, Garzillo was allowed to rely on the records of [the appellee's] treating physicians and was not required to be a treating physician.").

per year and a high range of $3,475 per year. He testified that "the estimated future cost and care identified in [his] plan will be for the usual, reasonable and customary charges, and it is a reasonable probability this care is necessary for the future treatment of the injuries sustained by Amy Ledgister on February 11, 2019." Further, he stated that the "numbers in [his] report are specific to the injuries caused by the automobile accident" and "not inclusive of care that would be for any other reason." To arrive at the cost of the injections, Garzillo told the jury to "look at the cost of the single injection" and then "multiple that by the number of years between her current years and life expectancy," which he testified would be forty-five years. In addition to the cost of the injections, he recommended a plan of "conservative care of management of the spinal structures in the joint" to "slow down that premature degenerative process that will happen in the spine as that herniated disk desiccates, as that becomes bone-on-bone[,] and as the body mechanics are altered."

As to causation, the following exchanges occurred between Garzillo and Ledgister's attorney:

Q. Is there any dollar figure in [your report] that's not 100 percent directly related to this car crash?

A. No.

. . . .

Q. It stated in your review of the records, the diagnosis of the causation by a medical physician, based on reasonable and medical probability, that the diagnostic testing, injuries and symptoms Amy Ledgister sought treatment for following

10

the collision were the result of the collision of February 11th, 2019. Do you see that, sir?

A. Yes.

Q. Do you concur with their opinion that the cause of her injuries were related to her 2/11, or February 11th, 2019, collision?

A. Yes.

. . . .

Q. Do you agree with the differential diagnoses reached by the treating physicians of Amy Ledgister ruling out all the possibilities and coming down to one probability that this car crash caused the injuries that she's complaining about?

A. Yes.

In addition to Garzillo's report, medical records from MRI Centers of Texas, Epic Pain & Orthopedics, SOAR, Texas Healthcare, First Medical Group, and Uptown Radiology were admitted into evidence.

## C. The Jury's Award and Rangel's Post-Trial Motions

At the conclusion of trial, the jury awarded Ledgister the following damages:

- Physical pain sustained in the past $15,550;

- Mental anguish sustained in the past $0;

- Physical impairment sustained in the past $7,775;

- Physical pain that, in reasonable probability, Ledgister will sustain in the future $0;

11

- Mental anguish that, in reasonable probability, Ledgister will sustain in the future $0;

- Physical impairment that, in reasonable probability, Ledgister will sustain in the future $0; and

- Medical expenses that, in reasonable probability, Ledgister will incur in the future $1,806,744.[7]

The trial court later signed a final judgment in accordance with the jury award.[8]

Rangel filed a motion for new trial and a motion for judgment notwithstanding the verdict. Following a hearing on those motions, the trial court signed orders denying them. This appeal followed.

## III. DISCUSSION

In his sole issue, Rangel argues that the evidence is insufficient to support the jury's award of future medical expenses "because there was no evidence, or alternatively, factually insufficient evidence, that the car accident caused any or all of [Ledgister's] future medical expenses." In response, Ledgister criticizes what she calls this "minimalist defense strategy," whereby at trial, Rangel did not dispute the

---

[7]Rangel notes in his brief that the "difference between the full forty-five years of the experts' recommended medical expenses—$1,810,219.05—and the $1,806,744 awarded by [the] jury is $3,475.05." According to Rangel, "it appears that the jury followed the chart in Garzillo's report for future care starting when [Ledgister] is thirty-nine years old and awarded one less year of care from Garzillo's plan than the forty-five years to which he testified at trial."

[8]The final judgment also included an award of $13,097.90 to Ledgister for reasonable and necessary medical expenses incurred in the past, an amount that had been stipulated to by the parties at trial.

12

reasonableness or necessity of Ledgister's medical bills and treatment, did not question Ledgister's experts about the bases of their opinions on causation and damages, and did not call any witnesses to testify on his behalf.

## A. Standards of Review

### 1. Legal Sufficiency

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co., Inc. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

Anything more than a scintilla of evidence is legally sufficient to support a finding. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727–28 (Tex. 2003). More than a scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Gunn*, 554 S.W.3d at 658. On the other hand, no more than a scintilla exists when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence. *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 397 (Tex. 2019); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

### 2. Factual Sufficiency

When an appellant challenges the factual sufficiency of the evidence supporting an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In conducting a factual-sufficiency review, we examine, consider, and weigh all of the evidence that supports or contradicts the factfinder's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989).

However, the jury is the sole judge of the witnesses' credibility, and a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). While a jury's decision regarding credibility must be reasonable, jurors "cannot ignore undisputed testimony that is clear, positive,

14

direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller*, 168 S.W.3d at 820.

## B. Applicable Law

Establishing causation—the element at issue here—in a personal-injury case requires a plaintiff to "prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries." *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015). Thus, "when an accident victim seeks to recover medical expenses, she must show both 'what all the conditions were' that generated the expenses and 'that all the conditions were caused by the accident.'" *Id.* (quoting *Guevara v. Ferrer*, 247 S.W.3d 662, 669 (Tex. 2007)).

"[C]ompetent evidence is required to prove the existence and nature of a condition and a causal relationship to the event sued on even though, in limited circumstances, the existence and nature of basic conditions, proof of a logical sequence of events, and temporal proximity between an occurrence and the conditions can be sufficient to support a jury finding of causation without expert evidence." *Guevara*, 247 S.W.3d at 667. Causation cannot be established by mere conjecture, guess, or speculation. *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980).

Expert testimony generally is necessary to establish causation of medical conditions that are "outside the common knowledge and experience of jurors." *Guevara*, 247 S.W.3d at 665; *see also, e.g.*, *Bernard v. Rangers Baseball, LLC*, No. 02-19-

15

00194-CV, 2020 WL 3869626, at *2–3 (Tex. App.—Fort Worth July 9, 2020, no pet.) (mem. op.). While "[a] layperson has common knowledge of medical conditions like broken bones and lacerations and that those conditions can be caused by an accident like a fall," *Bernard*, 2020 WL 3869626, at *3, expert testimony is required to establish a causal nexus for injuries that are outside of common knowledge, such as when a car accident causes a herniated disc. *See Lara v. Bui*, No. 01-21-00484-CV, 2023 WL 2249205, at *6 (Tex. App.—Houston [1st Dist.] Feb. 28, 2023, pet. denied) (mem. op.) (holding that appellant needed expert testimony to establish causal connection between car accident and his claimed injuries of two herniated discs, cervicalgia, lumbalgia, and lumbar radiculopathy); *Kemp v. Havens*, No. 14-05-00060-CV, 2006 WL 1140319, at *2 (Tex. App.—Houston [14th Dist.] Apr. 27, 2006, no pet.) (mem. op.) ("[E]xpert testimony is required to establish a causal nexus between [the defendant's] conduct and [the plaintiff's] alleged disk herniation.").

To constitute evidence of causation, a medical expert's opinion must rest in reasonable medical probability. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). Whether expert testimony on causation rests on a reasonable medical probability must be determined by the substance and context of the testimony rather than semantics or use of a particular term or phrase. *Smith v. Landry's Crab Shack, Inc.*, 183 S.W.3d 512, 514 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

A plaintiff "is not required to establish causation in terms of medical certainty nor is [s]he . . . required to exclude every other reasonable hypothesis." *Bradley v.*

16

*Rogers*, 879 S.W.2d 947, 954 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Or stated another way, a plaintiff is not required to show that the defendant's negligent act or omission was "the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." *Bustamante*, 529 S.W.3d at 457.

In addition, "a medical causation expert need not disprove or discredit every possible cause other than the one espoused by him[self]." *Transcon. Ins. Co.*, 330 S.W.3d at 218 (internal quotation marks and citation omitted). Only if the evidence presents other plausible causes of the claimed injuries or conditions must the plaintiff offer evidence excluding those causes with reasonable certainty. *JLG Trucking, LLC*, 466 S.W.3d at 162.

## C. Analysis

Here, because Rangel stipulated that his negligence caused the February 2019 accident, the sole remaining issue at trial with respect to Ledgister's compensatory damages was whether and to what extent the accident caused her to suffer the medical conditions for which she sought compensation. *See Williams v. Crawford*, No. 03-16-00696-CV, 2018 WL 1124306, at *2 (Tex. App.—Austin Mar. 2, 2018, no pet.) (mem. op.). On appeal, Rangel challenges only the award of future medical expenses.

Rangel argues that the evidence was legally and factually insufficient to support the jury's award of future medical expenses because the respective testimonies from Gumbrecht and Garzillo were conclusory and failed to explain "how and why the

17

breach caused the injury based on the facts presented."[9]  Rangel does not assert that either doctor was unqualified to testify as an expert witness in this case.  Nor does he claim that their testimony is unreliable.

An opinion is conclusory if no basis for the opinion is offered or if the basis offered provides no support for the opinion.  *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019); *City of San Antonio*, 284 S.W.3d at 816; *City of Laredo v. Limon*, No. 04-12-00616-CV, 2013 WL 5948129, at *4 (Tex. App.—San Antonio Nov. 6, 2013, no pet.) (mem. op.); *see Lara*, 2023 WL 2249205, at *7 ("An expert's bare proclamation that

[9]Ledgister spends a significant portion of her brief arguing that Rangel waived his sufficiency complaints.  She notes that he did not file a motion to exclude the testimony of either of her experts or object to the substance of their testimony at trial.  Following a jury trial, a legal-sufficiency challenge may be preserved in the trial court in one of the following ways:  (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial.  *In re D.T.*, 625 S.W.3d 62, 75 n.8 (Tex. 2021).  To preserve a factual-sufficiency challenge, a party must file a motion for new trial.  *Id.*; *see also* Tex. R. Civ. P. 324(b)(2)–(4).  We note that in both Rangel's motion for new trial and his motion for judgment notwithstanding the verdict, he argued that the respective testimonies of Gumbrecht and Garzillo were legally and factually insufficient to support the jury's award.  Therefore, we hold that Rangel has not waived his complaints.  *See D.T.*, 625 S.W.3d at 75 n.8; *cf. Perez v. Williams*, No. 02-21-00395-CV, 2022 WL 17351581, at *5 (Tex. App.—Fort Worth Dec. 1, 2022, no pet.) (mem. op.) (stating that appellant's motion for new trial that only challenged factual sufficiency—not legal sufficiency—of jury's award for past medical expenses failed to preserve his legal-sufficiency complaint but did preserve his factual-sufficiency complaint); *see also City of San Antonio v. Pollock*, 284 S.W.3d 809, 816–17 (Tex. 2009) (explaining that "a party may complain that conclusory opinions are legally insufficient evidence to support a judgment even if the party did not object to the admission of the testimony" but an objection is required "[w]hen a scientific opinion is not conclusory but the basis offered for it is unreliable").

18

this one event caused another is not enough to establish causation; 'the expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented.'" (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010))). Experience alone may provide a sufficient basis for an expert opinion. *Windrum*, 581 S.W.3d at 769.

### 1. Gumbrecht—anesthesiologist and pain doctor

Gumbrecht testified that he had examined Ledgister and performed a general examination and a musculoskeletal examination of her. In addition, he performed Spurling's Maneuver and facet loading on her to assess her neck pain, and both tests had "positive results."

In addition, Gumbrecht reviewed Ledgister's MRI from April 2019—an MRI that was taken two months after the car collision—and Porter's report, as well as the records from Ledgister's visit to SOAR. The MRI revealed that Ledgister had three herniated discs. The SOAR records stated that Ledgister came in "for a chief complaint of Neck Pain, involving the cervical spine" which "occurred in the context of being involved in a motor vehicle accident on 02/11/2019," and she had "no pertinent history." The records also indicated that Hothem, at SOAR, had diagnosed Ledgister with cervicalgia, cervical herniated disc, muscle spasm, and cervical facet joint syndrome.

Based on his examination and review of the records, Gumbrecht testified that Ledgister's injuries were the result of the February 11, 2019 motor vehicle accident.

19

He went on to explain what a differential diagnosis was and that it was still his conclusion that the motor vehicle accident caused Ledgister's cervical herniated discs.

As a treating doctor, Gumbrecht did not have to disprove or discredit every possible alternative cause of Ledgister's medical condition to testify about causation to a reasonable medical probability. *See Hunter v. Tex. Farm Bureau Mut. Ins. Co.*, 639 S.W.3d 251, 265 (Tex. App.—Houston [1st Dist.] 2021, no pet.) ("As a treating doctor, Vije did not have to disprove or discredit every possible alternative cause of Hunter's medical conditions to testify about causation to a reasonable medical probability."). And in this case, there was no other evidence of a cause of the injury presented. *See Transcon. Ins. Co.*, 330 S.W.3d at 218 ("Still, if evidence presents 'other plausible causes of the injury or condition that *could* be negated, the [proponent of the testimony] *must* offer evidence excluding those causes with reasonable certainty.'" (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997))). Therefore, Gumbrecht's testimony was not conclusory by failing to address other unspecified alternative theories of causation. *See JLG Trucking, LLC*, 466 S.W.3d at 165 (stating that it is plaintiff's burden "to exclude with reasonable certainty other plausible causes of her injuries supported by the record").

### 2. Garzillo—chiropractor and life care planner

Testifying in two capacities, Garzillo stated that he reviewed Ledgister's medical records before preparing his life care plan and report. He testified that the numbers in his report were "specific to the injuries caused by the automobile

20

accident" and were "not inclusive of care that would be for any other reason." He further testified that there was no dollar figure in his report that was not "100 percent directly related" to the car accident and that the cause of Ledgister's injuries was related to her February 11, 2019 collision. He also agreed with the differential diagnoses reached by Ledgister's treating physicians that ruled out all of the other possibilities and concluded that the car accident caused her injuries.

His report, also admitted into evidence, stated, "Included in the medical records of Amy Ledgister, there is a differential diagnosis of her injuries and a differential diagnosis of the causation by a medical physician with the reasonable medical probability that the diagnostic testing, injuries, and symptoms Amy Ledgister sought treatment for following the automobile collision on 2/11/19 were the result of the collision on 2/11/19." Garzillo stated in the report that he "concur[red] with the medical physician" and "believe[d] the future care and cost in this medical cost projection is necessary because of injury sustained on 2/11/19."

In formulating his opinions, Garzillo was permitted to rely on the records of Ledgister's treating physicians. *See Silva*, 2022 WL 3500008, at \*9; *see also* Tex. R. Evid. 703. And Garzillo's expert testimony was allowed to aid the jury in its decision. *See Silva*, 2022 WL 3500008, at \*9; *see also* Tex. R. Evid. 702.

### 3. Ledgister

Ledgister also testified about the accident, stating that she sought chiropractic care for the first time eleven days after the accident. While that helped her pain, she

later sought more help because her neck pain was still causing her discomfort. After getting an MRI, she sought additional treatment at SOAR, whose records indicate that her neck pain "occurred in the context of being involved in [a] motor vehicle accident on 02/11/2019."

"In personal injury cases, trial evidence generally includes evidence of the pre-occurrence condition of the injured person, circumstances surrounding the occurrence, and the course of the injured person's physical condition and progress after the occurrence." *Guevara*, 247 S.W.3d at 666–67. "Evidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions." *Id.* at 668. While this suspicion is not legally sufficient to support a finding of legal causation, when combined with other causation evidence that conditions exhibited themselves or were diagnosed shortly after an event—such as the testimony of Gumbrecht and Garzillo—it may be probative in determining causation. *See id.*

### 4. Court's Charge

Here, Question No. 1 of the charge asked the jury, in broad form, to determine "[w]hat sum of money, if paid now in cash, would fairly and reasonably compensate AMY LEDGISTER for her injuries, if any, that resulted from the occurrence in question?" By awarding *any* damages to Ledgister, the jury necessarily found that the injuries for which Ledgister sought compensation had resulted from the February 2019 accident. *See Williams*, 2018 WL 1124306, at *10 ("By awarding *any*

22

damages to [appellee], the jury necessarily found that *at least some* of the injuries for which [appellee] sought compensation had 'resulted from [the May 2012 accident].'"). Here, the future medical expenses awarded by the jury fell within the range of the evidence. *See Silva,* 2022 WL 3500008, at *10.

### 5. Legal and factual sufficiency of the evidence

Based on the evidence of the temporal proximity of the onset of Ledgister's symptoms—the neck pain—together with Gumbrecht's and Garzillo's testimony and Ledgister's post-accident MRI results and examinations, the jury could have reasonably inferred that her future medical expenses were proximately caused by the February 11, 2019 motor vehicle collision. *See Guevara,* 247 S.W.3d at 666–67; *see also Hulsey v. Attalla,* No. 01-18-00180-CV, 2019 WL 3484082, at *8 (Tex. App.—Houston [1st Dist.] Aug. 1, 2019, no pet.) (mem. op.) ("Based on the evidence of the temporal proximity of the onset of Attalla's symptoms, i.e., the debilitating pain in his back that began after the collision, together with the testimony of Drs. Cotler and Bishai about the pre- and post-collision MRI results, their examinations of Attalla, and their experience as a board-certified orthopedic surgeon and board-certified pain-management specialist, respectively, the jury could have reasonably inferred that Attalla's injuries were proximately caused by the collision and not simply by degeneration, the only other possible cause for his injuries suggested by the record."). Moreover, there was no evidence of any "other plausible causes of the injury or condition that could be negated." *Transcon. Ins. Co.,* 330 S.W.3d at 218.

Having considered the evidence in the light most favorable to the jury's verdict, we conclude that there is legally sufficient evidence to support the jury's award of future medical expenses; having considered all of the evidence, we conclude that there is factually sufficient evidence to support the jury's award. *See Trinh v. Zayas-Niubo*, No. 14-23-00338-CV, 2024 WL 931865, at *3 (Tex. App.—Houston [14th Dist.] Mar. 5, 2024, no pet. h.) (mem. op.) (holding that expert's opinion on causation was not conclusory because he considered plaintiff's "subjective reports of pain, the history of her complaint, her past medical history, the possible sources of pain, her physical examination, and MRI studies"); *Port of Hous. Auth. v. Morales*, No. 14-21-00052-CV, 2022 WL 4103184, at *6 (Tex. App.—Houston [14th Dist.] Sept. 8, 2022, no pet.) (mem. op.) (holding that expert's opinion was not conclusory because, "before opining that the gantry accident caused Morales's injuries, [the expert] performed an extensive clinical examination of Morales" and "reviewed Morales's MRIs"); *City of Laredo*, 2013 WL 5948129, at *4 (holding that expert's opinion was not conclusory because the expert "provided a factual basis to support his opinion based on his examination of [the plaintiff] and his review of [the plaintiff's] medical records").

We overrule Rangel's sole issue.[10]

---

[10]In a one-sentence section of his brief that follows his arguments relating to the sufficiency of the evidence, Rangel states, "In the further alternative, Appellant seeks a substantial remittitur as to all future medical expenses for which proper expert evidence was required but not provided at trial." We decline to order a remittitur

## IV. CONCLUSION

Having overruled Rangel's sole issue, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  April 18, 2024

---

because the evidence of Ledgister's future medical expenses is factually sufficient to support the jury's award. *See Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 115 (Tex. App.—San Antonio 2011, pet. denied) ("Because we hold the evidence is factually sufficient to support the damage award, we deny Geis's request for a suggestion of remittitur."); *Morrell v. Finke*, 184 S.W.3d 257, 290 (Tex. App.—Fort Worth 2005, pet. denied) ("We likewise decline to order a remittitur because the evidence that Madeline will require between $4.2 and $5.4 million in future medical expense is factually sufficient to support the jury's award of $3.5 million in future medical expenses.").